No. 14591

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

STATE OF MONTANA,

Plaintiff and Respondent,

vs.

ANDREW C. SUNDAY,

Defendant and Appellant.

Appeal from: District Court of the First Judicial District,
Honorable W. W. Lessley, Judge presiding.

Counsel of Record:

For Appellant:

A. Michael Salvagni argued, Bozeman, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Richard Larson argued, Assistant Attorney General,
Helena, Montana
Charles Graveley argued, County Attorney, Helena, Montana

Submitted: January 14, 1980

Decided: MAR 27 1980

Filed: MAR 27 1980

Thomas J. Kearney
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Andrew C. Sunday appeals from convictions entered in the District Court, First Judicial District, Lewis and Clark County, on charges of deliberate homicide, burglary and theft, in violation of sections 45-5-102, 45-6-204 and 45-6-301, MCA, respectively.

Sunday came to Montana in early September 1977 with James Wilson, Donna Mitchell and Mitchell's three year old daughter. On September 4, 1977, they stopped their car at a rest area on Highway 200, east of the continental divide near Lincoln, Montana. Desiring to "get away from all the hassles" and "live off the land", they packed up supplies and walked into the wilderness along the continental divide.

It soon became apparent they could not go far on foot. So, in the early morning hours of September 5, 1977, Sunday and Wilson took three horses from the Evergreen resort owned and operated by Kenneth and Marion McLean. Additionally, they broke into a tack shed which was used for storing horse tack used in the McLeans' horse-renting business. They took three saddles and three bridles. The tack shed was eight feet by twenty feet and was made out of rough lumber. It contained no living facilities.

Sunday, Wilson and the Mitchells spent the next two days riding the horses along the continental divide. On the afternoon of September 6, 1977, they saw a pickup truck rapidly approaching. They tried to escape into the trees but were cut off by the pickup. The pickup was driven by Kenneth McLean. His wife was also in the pickup. Kenneth McLean stopped the pickup about sixty-five feet from Sunday, Wilson and the Mitchells.

Kenneth McLean got out of the pickup carrying a .308 caliber bolt action revolver. His wife got out carrying a .38 caliber revolver. Sunday dismounted from his horse holding a 30.30 caliber rifle. Wilson testified Sunday asked Wilson if he wanted the privilege of shooting the McLeans. Wilson had a 22.250 caliber bolt action rifle, and Mitchell had a .410 gauge single shot shotgun.

As Kenneth McLean approached, he said, "What the God damn hell is going on? What kind of prank is this? Give us our horses, or we will shoot you." Mrs. McLean added, "Your God damn right we will." Immediately after his threat, McLean operated the bolt mechanism to his gun and inserted a cartridge. According to Sunday, Kenneth McLean pointed the gun directly at Sunday. Wilson and Mitchell testified the gun was pointed at the ground.

A shooting spree followed. Sunday shot Kenneth McLean in the leg. Then, Marion McLean began shooting at Sunday. Sunday returned the fire hitting Marion McLean in her abdomen and thoracic area. Sunday next approached Marion McLean. Noticing Kenneth McLean rise from the ground, Sunday turned and fired two fatal shots at Kenneth McLean. Meanwhile, Wilson who was approaching Kenneth McLean noticed Marion McLean rise. Wilson shot Marion McLean in the head killing her instantly.

Sunday then took $25 from Kenneth McLean's wallet. Wilson took approximately $100 from Marion McLean. Sunday, Wilson and Mitchell picked up the McLeans' weapons and left the area in the McLeans' pickup. They were eventually arrested in Oregon.

On September 26, 1977, Sunday was charged in an amended information with two counts of deliberate homicide, two counts of felony theft and one count of burglary.

-3-

In October 1977, Sunday gave notice of his intent to rely on self-defense. On January 9, 1978, Sunday moved for a change of venue. The motion was denied on April 12, 1978, on the ground any possible prejudice was "speculation at this point."

On July 6, 1978, Sunday moved for permission to conduct individual voir dire of the prospective jurors. The motion was denied, but the District Court said the motion might be renewed during voir dire if necessary. Sunday renewed the motion during voir dire with respect to one prospective juror, Mrs. Garrett. The District Court again denied the motion saying it would guide Mrs. Garrett. Sunday passed the panel without challenging Mrs. Garrett for cause. Later, both the State and Sunday exercised all eight of their preemptory challenges.

In July 1978, a jury verdict was rendered finding Sunday guilty of all the charges. Sunday was sentenced to a total of 240 years in the state penitentiary.

Sunday presents eleven issues for review. These issues may be grouped as follows:

1. Whether it was error to deny Sunday's motions for change of venue and individual voir dire of jurors.

2. Whether the State failed to prove the crimes charged against Sunday;

3. Whether the District Court failed to properly instruct the jury; and

4. Whether the sentences imposed on Sunday were erroneous.

ISSUE NO. 1: Change of Venue and Individual Voir Dire.

Sunday contends it was error to deny his motions for change of venue and individual voir dire. The contention is without merit.

-4-

A denial of a motion for change of venue or a motion for individual voir dire will be reversed only upon a showing of an abuse of discretion. State v. Olson (1971), 156 Mont. 339, 480 P.2d 822. Sunday has not made such a showing.

A change of venue must be based on more than an affiant's unsupported opinions and the mere fact of pretrial publicity. The published accounts must be so passionate as to excite undue prejudice, to the extent of rendering it impossible for the accused to have a jury free from prejudice. State v. Corliss (1967), 150 Mont. 40, 49, 430 P.2d 632, 637.

Sunday's motion for change of venue was not adequately supported. The motion was supported by the single affidavit of defense counsel. The affidavit stated defense counsel believed Sunday could not receive a fair trial due to inflammatory county-wide publicity. The affidavit was unsupported by any evidence of the number or inflammatory nature of the publications. Also, Sunday never renewed his motion for a change of venue at any time during or after jury selection.

Sunday also did not adequately support his motion for individual voir dire. Sunday never demonstrated the extent of the pretrial publicity, its inflammatory nature or whether it had any prejudicial effect on the prospective jurors. Moreover, Sunday passed the jury panel, including Mrs. Garrett, the main object of Sunday's concern, without challenging any potential juror for cause due to bias or prejudice. See, section 46-16-304(2)(j), MCA.

ISSUE NO. 2: Failure to Prove the Crimes Charged.

Sunday maintains the State failed to prove Sunday committed burglary since the tack shed is not an "occupied structure" as required by section 45-6-204, MCA.

A fundamental rule of statutory construction is the intent of the legislature controls. Dodd v. City of East

-5-

Helena (1979), ___ Mont. ___, 591 P.2d 241, 243, 36 St.Rep. 414, 417. In construing legislative intent, this Court construes criminal statutes according to the fair import of their terms with a view to effect their object and to promote justice. State v. Shannon (1976), 171 Mont. 25, 28, 554 P.2d 743, 744.

The intent of the burglary statute was to prohibit wrongful intrusions into those places where the threat to people was most alarming. State v. Shannon, supra. Thus, in defining "occupied structure", the legislature included those places where the chance of human confrontation was most likely, in those places suitable "for human occupancy or night lodging" and "for carrying on business." Section 45-2-101(34), MCA.

The McLeans' tack shed was a structure suitable for carrying on business and was so used by the McLeans. The McLeans operated a horse rental business. Horse tack was an integral part of that business, and the horse tack was stored in the tack shed. Moreover, both the guests and employees of the Evergreen Resort would enter the shed frequently and at irregular hours.

Count V of the amended information charged Sunday with the felony theft of (1) a 1966 International pickup truck, (2) a .308 caliber rifle, (3) a .38 caliber Smith and Wesson pistol, (4) a gunbelt and holster, and, (5) $150 in cash. Sunday contends the State failed to prove the value of the personalty listed in count V exceeded $150 as is required by section 45-6-301, MCA, the theft statute. We agree.

Under our felony theft statute, the State must prove beyond a reasonable doubt that the value of the personalty allegedly taken exceeds $150. At trial, the only value testimony was given by Sunday and Mitchell and related to

-6-

the amount of cash taken from the McLeans. Sunday testified he took $20 to $25 from Kenneth McLean's wallet. Mitchell testified Wilson took about $100 from Marion McLean's purse.

The State asserts Sunday waived any objection to the State's failure to prove value by not raising the issue prior to the entry of the judgment of conviction. The State's assertion is without merit. Under the facts here, value is an essential element of the crime charged, and such an error may be raised at any time.

The State next asks this Court to take judicial notice of the fact that the aggregate value of the personalty involved here is greater than $150. We will not do this.

Rule 201(b), M.R.Evid., sets forth the kinds of facts which may be judicially noticed. That provision reads as follows:

> ". . . A fact to be judicially noticed must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned."

We will not go beyond the scope of this provision and take judicial notice of a basic element of the crime charged not otherwise proved.

It is also noteworthy that the jury was not properly instructed as to value. None of the instructions concerning felony theft mentioned that a value greater than $150 is necessary for a felony theft conviction. Thus, the jury reached its decision on the felony theft charge without even considering a fundamental element of the crime charged. We will not presume the jury knew about this element of felony theft.

Sunday next contends the convictions for the deliberate homicides of Kenneth and Marion McLean are not supported by

-7-

the evidence. More specifically, Sunday maintains the evidence establishes the homicides were justified, or at most, Sunday could be convicted of mitigated deliberate homicide.

Whether Sunday was justified in killing the McLeans and whether Sunday acted under extreme emotional distress were questions of fact for the jury. State v. Larson (1978), ____ Mont. ____, 574 P.2d 266, 269, 35 St.Rep. 69, 73. Upon appeal, this Court will not substitute its judgment for that of the jury if the verdict is supported by substantial evidence. The evidence must be viewed in a light most favorable to the State. State v. McGuinn (1978), ____ Mont.____, 581 P.2d 417, 419, 35 St.Rep. 871, 872.

The verdicts of deliberate homicide are supported by substantial evidence which if believed by the jury would result in convictions for deliberate homicide. Both Wilson and Mitchell testified Kenneth McLean did not point his rifle at Sunday. In addition, Wilson testified Sunday asked Wilson if he wanted the privilege of shooting the McLeans. Sunday's own testimony corroborates the sequence of events as described by Wilson and Mitchell.

Sunday also contends the evidence clearly shows Wilson's actions were the sole intervening cause of Marion McLean's death. Therefore, according to Sunday, it was error to submit count II of the amended information, the deliberate homicide of Marion McLean, to the jury. We do not agree.

Sunday shot Marion McLean in her abdomen and thoracic area. Shortly thereafter, Wilson shot Marion McLean in the head killing her instantly. A pathologist testified the wound inflicted by Sunday would have caused Marion McLean's death within minutes had she not been shot by Wilson.

-8-

The principal end of the law of homicide is to protect human life by preventing behavior which can cause death. The evidence adduced at trial clearly shows Sunday engaged in conduct which was likely to cause the death of a human being. Moreover, Sunday's situation would be no different if Marion McLean had been struck by a bolt of lightning rather than shot in the head by Wilson.

ISSUE NO. 3:   Instructional Error.

Court's instruction no. 16 reads as follows:

"You are instructed that a criminal homicide is deliberate homicide if:

"(1)   It is committed purposely or knowingly; or

"(2)   It is committed while the offender is engaged in flight after committing or attempting to commit burglary or any other felony which involves the use or threat of physical force or violence against any individual."

Sunday contends it was error to give the second part of the instruction concerning the felony-murder rule. According to Sunday, he was not charged under the felony-murder rule, there are no facts supporting the application of the rule, and even assuming proof of a felonious act, there was no showing of a connection between it and the McLeans' death.

Sunday's contention is without merit. The evidence establishes that Sunday caused the McLeans' death while in flight after committing a burglary. Court's instruction no. 16 paraphrases section 45-5-102, MCA, the statute defining deliberate homicide. That statute specifically covers criminal homicides committed while in flight after committing a burglary. The connection between Sunday's felonious act and the McLeans' death was decided by the jury. As was stated in Commonwealth v. Almeida (Pa. 1949), 68 A.2d 595, 611-612:

-9-

". . . There can be no doubt about the 'justice' of holding that felon guilty of murder in the first degree who engages in a robbery or burglary and thereby inevitably calls into action defense forces against him, the activity of which forces result in the death of a human being."

Additionally, at trial, Sunday did not require the State to specify which theory of deliberate homicide the State was following. Nor did Sunday object to the court's instruction no. 16 on the grounds now asserted upon appeal. This Court will not reverse the District Court's rulings on the instructions on grounds not raised at the time the instruction was proposed. State v. Campbell (1965), 146 Mont. 251, 263, 405 P.2d 978, 987.

Sunday next contends the jury was incorrectly and incompletely instructed on the affirmative defense of self-defense. In this regard, Sunday asserts the court's instructions (1) failed to explain self-defense as a concept of fear to be judged in light of appearances and (2) failed to explain Sunday had no duty to retreat.

In considering this issue, we will first set out the relevant law applicable to the concept of self-defense. A person is justified in the use of force likely to cause death or serious bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or serious bodily harm to himself or another or to prevent the commission of a forcible felony. Section 45-3-102, MCA. Self-defense is to be judged in terms of the apparent danger which the defendant perceived, as a reasonable person, rather than in terms of the danger actually confronting him. The belief in the necessity of using force must be reasonable, but even a mistaken belief may be reasonable. State v. Reiner (1978), ____ Mont. ____, 587 P.2d 950, 956, 35 St.Rep. 1861, 1867, 1869. A defendant may stand his ground even if he reasonably believes he is in imminent danger of great bodily harm. See State v. Porter (1964), 143 Mont. 528, 391 P.2d 704.

-10-

Sunday cannot complain if these concepts were conveyed to the jury by the District Court in the body of its instructions. If so, Sunday was given ample opportunity to present his theory of defense to the jury. State v. Collins (1978), ___ Mont. ____, 582 P.2d 1179, 35 St.Rep. 993. We find such is the case here.

The jury was instructed that self-defense was a concept of fear to be judged in light of appearances even if those appearances were false. Court's instruction no. 27 and 31 directed the jury to consider whether Sunday "reasonably believed" that force by him was necessary. These instructions do not say that reasonable belief must be founded upon subjective appearances or the danger actually confronting Sunday. State v. Reiner, supra. Similarly, instructions, like court's instructions no. 27 and 31, which state the general law of self-defense adequately cover. Montana's "no retreat" rule. State v. Porter, supra.

District Court's instruction no. 28 instructed the jury that Sunday had the burden of producing sufficient evidence to raise a reasonable doubt of his guilt in order to avail himself of the affirmative defense of self-defense. Sunday maintains it was error to give this instruction. We do not agree.

Sunday contends the instruction is misleading and confusing when compared with court's instruction no. 17 which instructed the jury that the State had the burden of proving lack of justification. Sunday is barred from asserting this upon appeal as a ground for reversible error. This was not a ground of his objection at trial. State v. Campbell, supra.

Sunday next asserts that court's instruction no. 28 is an incorrect statement of the law. The assertion is without merit.

In Montana, the defendant must present some evidence of self-defense in order to raise it as an issue unless the State's

-11-

evidence puts self-defense in issue. State v. Cooper (1979), ____ Mont. ____, 589 P.2d 133, 36 St.Rep. 30.

At trial, Wilson and Mitchell, both witnesses for the State, testified Kenneth McLean did not point his gun at Sunday. Wilson also testified that Sunday asked Wilson if he wanted the privilege of shooting the McLeans. The State did not raise the issue of self-defense by showing the totality of the circumstances surrounding the homicides including evidence which negates the application of self-defense.

Finally, Sunday contends court's instruction no. 28 unconstitutionally shifted the burden of proving self-defense to Sunday. It did not. The absence of justification is not an element of deliberate homicide, and proving lack of justification does not serve to negate any of the facts which the State must prove beyond a reasonable doubt in order to support a conviction of deliberate homicide. Patterson v. New York (1977), 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281; State v. Cooper, supra.

Court's instruction no. 22 reads:

"You are instructed that purpose or knowledge are manifested by circumstances connected with the offense. Purpose or knowledge need not be proved by direct evidence, but may be inferred from acts, conduct and circumstances appearing in evidence."

Sunday maintains this instruction and court's instruction no. 23, "You are instructed that the law presumes that a person intends the ordinary consequences of his voluntary acts", are reversible error under Sandstrom v. Montana (1979), ____ U.S.____, 99 S.Ct. 2450, 61 L.Ed.2d 39. We do not agree.

Court's instruction no. 22 is a permissive inference. It allows, but does not require, the jury to infer ultimate facts from basic facts adduced by the State. No burden of proof is placed on Sunday. County Court of Ulster Cty. v. Allen (1979), ____ U.S. ____, 99 S.Ct. 2213, 2224, 60 L.Ed.2d 777, 792; State v. Coleman (1979), ____ Mont./____ P.2d ____, 36 St.Rep. 2237.

-12-

Since a permissive inference is involved, Sunday must show the invalidity of the inference as applied to him. Sunday must show there is no rational way under the facts of this cause for the jury to make the connection permitted by the inference. Only then is there a risk the presumptively rational jury will use the inference to make an erroneous factual determination. County Court of Ulster Cty. v. Allen, supra. Sunday has not carried his burden upon appeal.

Similarly, it was not prejudicial error to give court's instruction no. 23. The homicide charges against Sunday were submitted to the jury in the disjunctive, as a deliberate homicide or as a felony-murder case. Under either theory, Sandstrom v. Montana, supra, is not controlling.

A person is guilty of deliberate homicide if it is committed "purposely" or "knowingly." Section 45-5-102, MCA. A person acts "purposely" with regard to any offense if it is his conscious object (1) to engage in that conduct defined as the offense or (2) to cause a result which is the offense. Section 45-2-101(52), MCA. Applying this definition of purpose to this cause, if the jury found that Sunday consciously sought to kill or consciously conducted himself to cause a death as a result of his conduct, the elements of intent and act are merged in his conduct once purpose is shown. Thus, under the criminal code, proof that the defendant acted "purposely" is sufficient proof that he acted "knowingly". Section 45-2-102, MCA.

A person is shown to have acted "knowingly" with respect to deliberate homicide upon proof of either of two mental elements: (1) when he is aware of his conduct which constitutes an offense; or, (2) when he is aware that it is highly probable that a death of a human being will be the result of his conduct. Section 45-2-101(27), MCA. As we noted in State v. Coleman, 36 St.Rep. at 2242, it is his awareness either of his conduct

-13-

or the highly probable result of his conduct that must be proved beyond a reasonable doubt to establish his "knowledge" as a mental element of the crime. But we repeat, if purpose is shown beyond a reasonable doubt, knowledge is thereby established under the code.

Therefore, in simplest terms, the burden of the State here under the charge of deliberate homicide was to prove Sunday by a voluntary act caused the death of a human being while having the mental state described as "purposely" or "knowingly". Those are the material elements of a deliberate homicide under the Montana Criminal Code of 1973.

Here, the State proved beyond a reasonable doubt that Sunday purposely shot the McLeans. Sunday testified he fired the first shot at Kenneth McLean. In fact, it was not shown that Kenneth McLean even fired a shot. True, Sunday contends he acted purposely but that he was justified in defending himself. However, by Sunday's own admission, it was Sunday's conscious object to shoot the McLeans or to cause that result. Section 45-2-101(52), MCA. Therefore, the jury was never called upon to decide as an issue of fact whether Sunday acted purposely or knowingly to cause the death of a human being. Sunday's own testimony admitted that. Rather, the issue became whether Sunday's purposeful act was a justified use of force, self-defense. Section 45-3-102, MCA.

Court's instruction no. 23 was therefore superfluous. Sunday intended by his conduct to do the McLeans grave bodily harm. That was the ordinary consequence of his voluntary acts. The objected to instruction did not relate to a material issue in the cause and, at most, was harmless error. Such error is not cause for reversal. Section 46-20-701, MCA.

We are aware of the apparently conflicting opinion of the Court where self-defense is an issue, and the Sandstrom

-14-

instruction is involved, in Holloway v. McElroy (D.Ga. 1979), 474 F.Supp. 1363, 1368. The rationale of that Court is not explained. We find in this case that self-defense admits a purposeful act, but claims the purposeful act was justified.

Likewise, court's instruction no. 23 was not prejudicial error under the felony-murder theory submitted to the jury.

The felony-murder rule is embodied in the definition of deliberate homicide in the Montana Criminal Code of 1973. Section 45-5-102, MCA. Intent as such is not an element under the felony-murder rule.

The felony-murder statute requires proof of the following combination of elements:

1. The intent to commit a felony, burglary here;

2. An unintentional death caused by the attempt, perpetration or attempted escape of a felon; and

3. The death must be an outgrowth of the felony itself and related to the burglary by an unbroken chain of causation. Bassiouni, Substantive Criminal Law (1978), at 250, 251.

Earlier in this opinion, we affirmed the charge of burglary against Sunday. His intent to commit the burglary was proven by direct evidence and by Sunday's own admissions. Therefore, "purpose" as an element of that crime was established. Intent was no longer an issue under the felony-murder statute once it was shown by the evidence that Sunday committed a burglary and Sunday killed the McLeans while in flight after the commission of the burglary. It was the commission of the burglary which gave rise to the dangerous circumstances which invited the McLeans' deaths. The intent to commit the burglary was a sufficiently supplied intent for all the consequences including the homicides arising therefrom. Bassiouni, supra, at 247.

If the jury applied the felony-murder theory here, the court's instruction no. 23 was superfluous because the jury

-15-

had no issue of intent to decide. Intent was not an element of the deliberate homicides, and intent was not an issue before the jury. The instruction played no part in the jury's deliberations as to the deliberate homicides.

ISSUE NO. 4: Sentences.

Upon his convictions, Sunday was sentenced to serve 100 years for each count of deliberate homicide, 10 years for each theft count and 20 years for burglary. The terms are to be served consecutively, 240 years total, and Sunday is ineligible for parole or participation in the work furlough program.

Wilson pleaded guilty to two counts of deliberate homicide and to two counts of theft. He received a sentence of 100 years for each deliberate homicide count and 10 years on each theft count. The sentences are to be served concurrently, and while the county attorney will not recommend parole, he will not fight Wilson's parole.

Sunday contends the District Court did not have the authority to impose a 20 year sentence for burglary. As for the other sentences, Sunday asserts they are unconscionable and unjustified when compared to the sentences received by Wilson who was equally guilty.

We agree the District Court did not have the authority to sentence Sunday to 20 years for burglary. By statute, the maximum possible sentence for burglary is 10 years in the state penitentiary. Section 45-6-204, MCA. Accordingly, under section 46-20-703, MCA, we reduce Sunday's sentence for burglary to 10 years in the state penitentiary with the other provisions of the sentence to remain unchanged.

Likewise, also under section 46-20-703, MCA, we reverse the 10 year sentence Sunday received upon his conviction for felony theft as charged in count V of the amended information. The State failed to prove an essential element of felony theft in count V that the property taken exceeded $150 in value.

-16-

With regard to the terms of the other sentences imposed upon Sunday, we find the District Court did not abuse its discretion. All the other sentences are within the maximum allowed by law for each offense. Similarly, the other provisions of the sentence, no parole and no work furlough, are also proper under the applicable statute. Section 46-18-202, MCA. The District Court determined that the restrictions were necessary for the protection of society because of Sunday's extensive criminal record, his uncaring attitude and the malevolent way in which he killed the McLeans.

This Court will not second guess the trial judge, who after observing the demeanor and attitude of the defendant, uses his discretion in fixing punishment. Matter of Jones (1978), ____ Mont. ____, 578 P.2d 1150, 1155, 35 St.Rep. 469, 476.

Accordingly, Sunday's conviction for felony theft as charged in count V of the amended information and the sentence imposed thereon are reversed. The count V felony theft charge is dismissed. The twenty year sentence for burglary is reduced to ten years in the state penitentiary to be served under the other conditions laid down by the District Court. The burglary conviction is otherwise affirmed. Sunday's other convictions and the sentences imposed thereon are affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

Mr. Justice Daniel J. Shea dissents and will file a written dissent later.

- 17 -

No. 14591


STATE OF MONTANA,

      Plaintiff and respondent,

  vs.

ANDREW C. SUNDAY,

      Defendant and appellant.


DISSENT OF MR. JUSTICE DANIEL J. SHEA:



Dated:  May  5, 1980

Mr. Justice Daniel J. Shea dissenting:

For a number of reasons, the felony-murder instruction given in this case was improper. Hence, I would reverse the homicide convictions and order a new trial. I would, moreover, reverse and dismiss the burglary conviction because the tack shed was not an "occupied structure" within the meaning of the statute. With relation to count III of the theft charges, I would reach the same result there as was reached by the majority in relation to count V of the theft charges, thereby reversing and dismissing each theft charge for failure to prove and instruct upon an essential element.

THE FELONY-THEFT CHARGES AND THE MAJORITY DISPOSITION

Defendant was charged with two counts of felong theft-- counts III and V. Count III charged theft of personal property taken from the McLean ranch. This charge included theft of three rifles, two shotguns, and three horses. Count V charged theft of personal property after the commission of the homi- cides. This charge included theft of a pickup truck, a pistol, a rifle, a woman's purse, and $150 in cash. As the majority has stated, there was no direct evidence presented on the value of the items and the trial court totally failed to instruct the jury that value is an element of the offense.

In this appeal, defendant attacked only count V, contending that value was not proved. In relation to this contention, the majority held that value is an essential element of the offense of theft and that this Court will not take judicial notice of value because it is an essential element to be proved. With this I agree. Accordingly, the majority reversed the conviction on Count V and ordered/the charge dismissed. With this I also agree. I fail to understand, however, why, on the same basis, the majority did not also order reversal and

-18-

dismissal of the theft conviction on count III.  The same law applies to each count, and the State failed to prove value and the jury was not instructed the value was an essential element to be proved with relation to each count of theft.  How, under these circumstances, can a reversal and dismissal be ordered on count V and an affirmance be ordered with relation to count III?  Although the defendant did not raise any issue with relation to count III, this Court, under the plain error doctrine, can reach the same result with relation to count III as it has reached with relation to count V.

Based on the majority rationale that value is an essential element of the crime which must be proved beyond a reasonable doubt, and that we will not take judicial notice of the value of the items involved in order to uphold a conviction, I would also reverse and dismiss the theft conviction under count III.

## BURGLARY--THE TACK SHED WAS NOT AN OCCUPIED STRUCTURE WITHIN THE MEANING OF THE BURGLARY STATUTE

There are several reasons why the felony-murder rule has no application to the facts of this case.  As a starter, the tack shed was not an occupied structure within the meaning of the burglary statute.  Obviously, however, since the majority declares that the underlying felony for application of the felony-murder rule is burglary, it is necessary that it declare the tack shed to be an occupied structure.  Absent this holding, the felony-murder rule as applied here, would come tumbling down like a house of cards.  Thus the majority has killed two birds with one stone here.  By declaring the tack shed to be an occupied structure, it has affirmed the underlying burglary conviction, and also set the stage for

-19-

application of the felony-murder rule. This is a clear demonstration of what happens when an appellate court is result oriented--the law is created or expanded to fit the facts.

The burglary statute, section 45-6-204(1), MCA, provides that: "[A] person commits the offense of burglary if he knowingly enters or remains unlawfully in an <u>occupied</u> <u>structure</u> with the purpose to commit an offense therein." (Emphasis added.) The trial court instructed the jury that one of the essential elements for the crime of burglary which must be proved beyond a reasonable doubt is that the structure involved must have been an "occupied structure." (Instructions 12 and 13.) By instruction 13, the trial court told the jury that the first of two elements which must be proved beyond a reasonable doubt is "that the defendant knowingly and unlawfully entered or remained unlawfully within an occupied structure." "Occupied structure" was also defined for the jury (instruction 14, the statutory definition contained in section 45-2-101(34)):

> "You are instructed that "occupied structure" means any building, vehicle, or other place <u>suited</u> <u>for</u> human occupancy or night lodging or persons or for <u>carrying</u> <u>on</u> <u>business</u> <u>whether</u> <u>or</u> <u>not</u> <u>a</u> <u>person</u> <u>is</u> <u>actually</u> <u>present</u>. Each unit of a building consisting of two or more units separately secured or occupied is a separate occupied structure." (Emphasis added.)

The majority has seized upon the emphasized language of this instruction and declared that the tack shed is "suited . . . for carrying on business." The tack shed here is eight feet by twenty feet and is made out of rough lumber. Inside the shed there are nails and pegs for hanging horse tack, but there are no living facilities. The tack shed was used exclusively for storing horse tack. Entry to the tack shed was made in the very early morning hours of Sunday, September 5, 1977. There were no human beings then inside the tack shed.

The declaration that the tack shed was suitable for carrying on business goes beyond the intent of the criminal law commission, which, of course, drafted the statutes involved before they were presented to the legislature. The Revised Criminal Law Commission Comment states:

> "The core of common law concept of burglary was breaking and entering a dwelling house at night with intent to commit a felony therein. The scope of the offense has enlarged until under prevailing law, the offense may be com mitted by entry alone, in day time as well as by night, in any building, structure, or 'vehicle.'"

> "In this code, the 'occupied structure' is narrowly defined to include buildings where people can live or work and where intrusions are most alarming and dangerous. For example, the definition does not include barns, or abandoned buildings unsuited for human occupancy. In the case of a mine or ship, for example, fitness for occupancy would have to be proved. 'Entering or remaining unlawfully' is a concept which takes a middle ground between prevailing law which requires a breaking and its complete elimination in some modern legislation." (Emphasis added.)

There is nothing in the legislative record to indicate any construction beyond that given to it by the Criminal Law Commission. By its decision here, however, this Court has declared that any barn into which a human may venture, regardless of whether or not it is then occupied, is, within the meaning of the burglary statute, an occupied structure. This is an unwarranted statutory extension.

Before the trial of this case, defense counsel moved to dismiss the burglary charge because the tack shed was not an occupied structure within the meaning of the burglary statute.

-21-

The prosecutor /vigorously resisted dismissal of the burglary charge and the defense motion was denied.  Thus the case went to trial with defendant facing a burglary charge.  Neither he nor defense counsel had the wildest dream, however, that as a result of this burglary charge, the prosecution would inject another theory of homicide into the case by offering a felony-murder instruction at the end of the case.

Because the tack shed was not an occupied structure within the meaning of the burglary statute, the burglary conviction must be reversed and dismissed.

IN PERMITTING THE FELONY-MURDER INSTRUCTION TO STAND UNDER THE FACTS OF THIS CASE, THE MAJORITY HAS IGNORED SOME FUNDAMENTAL RULES OF CRIMINAL PROCEDURE

Vital to a charge of felony-murder is the fundamental requirement that it be charged if the prosecution expects a conviction on that theory.  Defendant was not charged with felony-murder--it is that simple.  He was charged in count I with "purposely or knowingly" killing Kenneth L. McLean, and he was charged in count II with "purposely or knowingly" killing Marion McLean.

The deliberate homicide statute (section 45-5-102, MCA) reads as follows:

> "(1)  Except as provided in 45-5-103(1), criminal homicide constitutes deliberate homicide if:
>
> "(a)  it is committed purposely or knowingly; or
>
> "(b)  it is committed while the offender is engaged in or is an accomplice in the commission of, an attempt to commit, or flight after committing or attempting to commit robbery, sexual intercourse without consent, arson, burglary, kidnapping, felonious esccape, or any other felony which involves the use or threat or physical force or violence against any individual."  (Emphasis added.)

-22-

By the clear wording of the statute, deliberate homicide can be committed in either of two ways.  Under subsection (1)(a), by "purposely or knowingly" killing the victim.  Under subsection (1)(b), by commiting an underlying felony which triggers application of the felony murder rule. The State, however, did not charge the defendant under both theories.

Count I related to the killing of Kenneth L. McLean, and the charging part of the information alleged that the defendant:

> ". . . committed the offense of DELIBERATE HOMICIDE, a felony in that [he] <u>purposely or knowingly</u> caused the death of <u>Lemul Kenneth McLean</u> by shooting him with a firearm . . ." (Emphasis added.)

And count II related to the death of Marion McLean.  The charging part of the information alleged that the defendant:

> ". . . committed the offense of DELIBERATE HOMICIDE, a felony, in that [he] <u>purposely or knowingly</u> caused the death of <u>MARION McLEAN</u> by shooting her with a firearm. . ."  (Emphasis added.)

Needless to say these charges do not allege facts which would permit invocation of the felony-murder rule.  Nor is there any indication by the charges that the prosecutor would rely on the felony-murder rule as an alternative theory of his case.  Defendant pleaded not guilty to counts I and II, he went to trial defending on those charges as specified, and the trial itself was conducted on the basis of those charges.  It is fundamentally unfair to add an additional theory at the end of the trial by offering an instruction containing the felony-murder rule.  That is precisely what the prosecutor did in this case.

PROCEDURAL ERROR IN PERMITTING THE FELONY-MURDER INSTRUCTION TO STAND

Assuming an evidentiary basis for application of the felony-murder rule, there is no doubt that the State had the

-23-

right to charge the defendant alternatively and to go to the jury on alternative charges or theories. Section 46-11-404(1), MCA, provides in part:

> "An . . . information . . . may charge . . .
> different statements of the same offense
> . . . under separate counts.. . . The prosecution
> is not required to elect between the different
> offenses or counts set forth in the . . . information
> . . ."

It is clear, therefore, that although there would be but one offense in relation to the death of each person, a jury could have returned a verdict finding defendant guilty under the "purposely or knowingly" theory or under the felony-murder theory, or under both theories.

But the crucial issue here is that the State had no right to present both theories to the jury in the absence of charges initially informing the defendant that he was charged under both theories. If the State desired to amend the information before trial and include an alternative count of felony-murder, it had the right to do so. In fact, section 46-11-403, MCA, entitled Amending the Charge, sets forth the procedure for amending an information. But no effort was ever made to amend the charges before the trial, or for that matter, at any time.

With the statutory background of section 46-11-404(1) and 46-11-403, MCA, in mind, I fail to see how a possible felony-murder conviction can be based upon a theory not charged in the information.

There is no indication in the record of why defense counsel at trial failed to catch the new theory sprung on the defendant by instruction 16, setting forth the felony-murder rule in addition to the charge that defendant "purposely or knowingly" killed the McLeans. Trial counsel did not represent defendant on the appeal of this case (the reason

-24-

being that sometime after the conviction in this case, he went to work for the county presecutor who tried this case). It appears, nonetheless, that his failure to object to the felony-murder portion of the instruction, was inadvertent. His objection to the instruction was that it was repetitious of other instructions already defining deliberate homicide and the elements to be proved. It was indeed repetitious; but it went one step beyond this and injected the felony-murder theory into this case for the first time. It is fundamentally unfair that the prosecutor can be rewarded for his deliberate injection of a new issue and theory into the trial upon the settlement of instructions, in total violation of the procedural rules governing the charging of an offense. Why should a defendant be punished because the prosecutor has violated the basic procedural statutes governing his conduct as a prosecutor?

The majority's rationale for permitting the felony-murder instruction and possible conviction for felony-murder to stand, is more than tissue-paper thin. Waiver by failing to object to the instruction, and failure to move the court to require the prosecution to elect its theory to present to the jury, are the announced grounds.

As to waiver, the majority's reliance on State v. Campbell (1965), 146 Mont. 251, 405 P.2d 978, and cited by the State in its brief on this point, is misplaced. In Campbell, the raising of an objection to an instruction on one ground at trial, and on an entirely different ground on appeal, was held to constitute a waiver. But the instruction involved in Campbell did not inject into the trial an entirely new theory of the case. Here the State is rewarded for proceeding in blatant violation of the underlying statutory guidelines for charging and amending criminal charges. A waiver theory must have as its underlying foundation, a belief that the

-25-

error was not so fundamental as to require a reversal. Here the error is so fundamental, and so palpable, that a reversal is required.

As its second procedural reason for turning down defendant's argument with relation to the felony-murder instruction, the Court states: "Additionally, at trial, Sunday did not require the State to specify which theory of deliberate homicide the State was following." In the context of this case, this rationale has no application at all.

Where only one theory has been charged it is rather difficult and meaningless to require a defendant to move to require the prosecutor to specify which theory he will rely on in asking the jury to reach a decision. The charges contained no basis upon which a defendant could make such a motion. Furthermore, assuming that defendant was charged alternatively with felony-murder, there was no basis in the law upon which a defendant could successfully move that the State elect its theory. Section 46-11-404(1), supra, specifically allows alternative charges and states, moreover, that ". . . The prosecution is not required to elect . . ."

Here the error is plain and the prejudice manifest. This Court has a duty to recognize such manifest errors and take the necessary corrective measures. Indeed, under the plain error doctrine this Court can take the necessary corrective action where the error has affected the substantial rights of the parties. The only remedy here is to grant defendant a new trial.

For reasons that I am unable to fathom, there is an ever present tendency of this Court to relieve the trial courts of their affirmative duties to properly instruct the jury on the applicable law of the case. As far as I am concerned

-26-

such duty inhere in the office of a district judge and cannot be delegated to trial counsel for either party. Although the duty is equally clear in civil and criminal cases, life and liberty is at stake in criminal cases and thus there are more compelling reasons to require the District Court to properly instruct the jury. In this respect, the trial judge cannot be an idle participant, leaving it to counsel to provide the appropriate instructions for the jury. There is, of course, a strong duty of counsel to aid the trial court in preparing the appropriate instructions, but the ultimate duty cannot be delegated to counsel.

Here it was the plain duty of the prosecutor to refrain from offering an instruction which injected a theory of criminal homicide which had not been specifically charged. It was further the duty not to offer an instruction on a theory which has no evidentiary basis. It was equally the duty of the trial court not to permit the prosecutor to receive the benefit of an additional theory of criminal responsibility where such theory has not been charged and where the trial has not been conducted on that basis. Furthermore, it is the duty of a trial court to reject an instruction which offers a theory upon which there is no evidentiary basis.

THE FELONY-MURDER INSTRUCTION GIVEN WAS INACCURATE AND AN IMPROPER STATEMENT OF THE LAW

Assuming a procedural and evidentiary foundation to give a felony-murder instruction, the instruction as given is a clear deviation from what would be a proper instruction. The majority has based the appropriateness of the instruction on its conclusion that defendant committed the underlying felony of burglary. But the instruction was not worded in such terms that the jury could only find burglary as the

-27-

underlying felony. Rather, the instruction was an open invitation to the jury to find any underlying felony, even though not charged. Furthermore, the jury could well have determined that theft was the underlying felony which triggered the operation of the felony-murder rule.

As previously quoted, section 45-5-102(1)(b), MCA, creates a felony-murder situation if:

"it is committed while the offender is engaged in or is an accomplice in the commission of, or an attempt to commit, or flight after commiting or attempting to commit robbery, sexual inter-course without consent, arson, <u>burglary</u>, kidnapping, felonious escape, <u>or any other felony which involves the use or threat of physical force or violence against any individual</u>." (Emphasis added.)

If it was the State's contention that the underlying felony was burglary, the instruction should only have stated that burglary was the underlying felony upon which the State based its felony-murder theory. But the instruction included also the above-emphasized language from the statute, thus giving an open invitation to the jury to find another under-lying felony. The actual instruction (instruction 16, not quoted in the majority opinion), provides as follows:

"You are instructed that a criminal homicide is deliberate homicide if:

"(1) It is committed purposely or knowingly; <u>or</u>

"(2) It is committed while the offender is engaged in flight after committing or attempting to commit <u>burglary or any other felony which involves the use or threat of physical force or violence against any individual</u>." (Emphasis added.)

It is obvious from this instruction that the jury was not confined to determining only that flight after a burglary triggered the application of the felony-murder rule. Rather, the felony-murder rule, by this instruction, is triggered also by flight after "any other felony which involves the use or threat of physical force or violence against any individual." The State had absolutely no right to give this

-28-

open-ended instruction and the trial court had a positive duty to reject this open-ended instruction.

USE OR IMPACT OF THE FELONY-MURDER INSTRUCTION GIVEN IN THIS CASE

After the enactment of the new criminal code in this State creating and defining substantive crimes, a book of jury instructions was circulated to many of the lawyers in this State, and in particular, to the prosecutors. It is entitled, Criminal Instructions--Montana. The book provides no information as to who published it, or who prepared the instructions and the comments in relation to the proper use of the instructions. In any event, instruction 59 purports to be the correct method of instructing the jury on the substantive crime of deliberate homicide. The instruction pertaining to felony-murder provides:

> "A criminal homicide is deliberate homicide if:

> "It is committed while the offender is [engaged] [an accomplice] in [the commission of] [an attempt to commit] [flight after committing or attempting to commit] [robbery] [sexual intercourse without consent] [arson] [burglary] [kidnapping] [felonious escape] or [any other felony which involves the use or threat of physical force or violence against any individual.]" (Emphasis added.)

The language, "or any other felony which involves the use or threat of physical force or violence against any individual," is bracketed. This language is not intended to be part of the instruction. Rather, if there is a felony involved which is not one of the enumerated felonies, but which nonetheless "involves the use or threat of physical force or violence against any individual", it must be so designated. Obviously, the drafter of this instruction realized that a felony-murder instruction could not be open-ended. But the prosecutor ignored the law in this case and submitted an open-ended instruction.

-29-

If the jury arrived at its verdict through application of the felony-murder rule, there is no assurance that it determined the underlying felony to be burglary. The jury could have based its decision on a conclusion that theft was the underlying felony. The jury convicted the defendant of two counts of felony theft. There was no instruction which told the jury that theft could not be used as a basis upon which to predicate the application of the felony-murder rule. Nor is there any assurance that the jury may have found some other felony not charged as the basis to apply the felony-murder rule. The instruction invited the jury to do so. It did not confine the jury to a consideration of those felonies charged as being the sole basis upon which it could apply the felony-murder rule.

Assuming that the jury did find theft as the underlying felony to apply the felony-murder rule, a conviction based on this theory cannot stand. First, felony theft is not one of the designated felonies contained in the felony-murder portion of section 45-5-102(1)(b); nor does it fall within the meaning of "any other felony which involves the use or threat of physical force or violence against any individual." Second, assuming that felony-theft can trigger the application of the felony-murder rule, since the underlying felony-theft convictions cannot stand in this case, neither can a felony-theft conviction based upon a theory that felony-theft triggered application of the felony-murder rule.

For purposes of distinguishing the crimes of theft and burglary in relation to the felony-murder rule, it is necessary to discuss the concept of burglary under the new criminal code. Burglary is singled out under the new code as being a crime the gravamen of which is the threat to human beings. In explaining the burglary statute, Montana Criminal Code, 1973, Annotated, at 236, the annotator speaks to this point:

-30-

"Perhaps the most significant of the changes introduced by the new code is the retreat from the prior view [the prior statutory view] that any building or vehicle could be the object of burglary to the view that to constitute burglary the acts must be directed against an occupied structure. The change reflects a return to the common law view that the gravamen of burglary was the threat to persons resulting from the wrongful intrusion. While the new code is not as technically restrictive it does require that the structure intruded into being either actually occupied or 'suited for human occupancy or night lodging of persons or for carrying on business.' (See §94-2-101(35) [now §45-2-101(34), MCA]. In effect this limits burglary to those situations in which the intrusion is most alarming and the threat to human life the greatest." (Emphasis added.)

Because a burglary, under certain circumstances, can be threatening to human beings, it is specifically designated in the felony-murder statute as being a felony which can trigger application of the felony-murder rule. Theft, of course, is not. The gravamen of theft is, an offense against property. See section 45-6-301, MCA, et seq. Nowhere in the annotator's note with reference to thef (Montana Criminal Code, 1973, Annotated, at 243-245) is there any indication that theft, by its nature, involves a threat of physical force or violence against an individual. Indeed, that is the reason burglary is distinguished from theft.

It is true that section 45-5-102(1)(b) specifically permits reliance on an underlying felony other than those which are specified within the statute itself. The requirement is that the felony relied on be "any other felony which involves the use or threat of physical force or violence against any individual." There can be no doubt however, that the prosecutor and the jury are not permitted to speculate as to choices of an underlying felony which may trigger the felony-murder rule by falling within the statutory definition. Felony theft is not a crime in which "the use of . . . physical force or violence against any individual" inheres in the crime itself.

-31-

The annotator's note to the theft statute, sets forth the general scope of the theft section of the criminal code:

> "This section on theft encompasses the traditional crimes of larceny, larceny by trick, false pretenses, embezzlement, receiving stolen property as well as numerous associated offenses. The Montana Criminal Law Commission intended that this section cover every conceivable form of theft and in so doing, eliminate the common law distinctions which encumbered virtually every one of the theft related offenses." (Annotated code, supra, at 243.)

It is abundantly clear that felony theft is not a crime which, under the felony-murder statute, "involves the use or threat of physical force or violence against any individual." The majority has based its opinion on an assumption that the jury found the underlying felony to be burglary. But there is no basis in the record from which we can make that determination. The jury was not instructed that burglary is a crime which involves "the use or threat of physical force or violence against any individual." From the jury's standpoint therefore, there was no reason to distinguish theft from burglary in determining which underlying felony to invoke as triggering application of the felony-murder rule. As far as the jury is concerned, the instruction permitted it to find theft as the underlying felony. Furthermore, the fact that defendant was convicted on both counts of felony theft is an indication that the jury may well have used felony theft as the underlying felony by which application of the felony-murder rule was triggered.

One cannot tell which underlying felony the jury invoked if it chose to apply the felony-murder rule in reaching its verdict. Obviously, if the jury did use felony theft as the underlying felony, the homicide conviction cannot stand. Just as clearly, since no one can tell whether the jury did or did not use felony theft as the underlying

-32-

felony, this Court should not permit the homicide convictions to stand.

THE FELONY-MURDER RULE HAS NO EVIDENTIARY FOUNDATION IN THIS CASE

I next proceed to the majority's conclusion that there was an evidentiary basis for the jury to base its verdict on the felony-murder rule. In essence, the majority concludes that the defendant was fleeing from a burglary, that there was a causal connection between the burglary and the deaths of Kenneth and Marion McLean, and therefore that the felony-murder applied. I have previously discussed my position that a burglary was not committed because the tack shed was not an "occupied structure" within the meaning of the statute. I have discussed my position that the open-ended felony-murder instruction given in this case could well have provided a basis for the jury to find an underlying felony other than the crime of burglary. This open-ended instruction, is, of course, error. But assuming the commission of a burglary to be within the statutory meaning, and assuming a proper felony-murder instruction, the facts of this case do not give rise to the application of the felony-murder rule. The McLeans were not within their rights to take the law into their own hands by arming themselves and later setting the scene for the armed confrontation and shootout.

Defendant and his accomplices came upon the McLean property at approximately 4:00 a.m. Sunday morning, September 5, 1977. They intended to take three horses and "get away from all the hassles" and "live off the land." These horses belonged to Kenneth Hoeffner but they were in the lawful possession of the McLeans. Defendant Sunday and his accomplice Wilson then entered the tack shed and took three bridles,

-33-

three saddles, and three pairs of chaps. As to the use of the tack shed, an employee testified that other employees or guests went into the tack shed from time to time to obtain or replace the riding equipment. There is no testimony that employees or guests went into the tack shed between nightfall and sunrise, the time when the entry was made here.

As a result of his entry into the tack shed, defendant was charged with burglary. The prosecutor alleged that the tack shed was an "occupied structure." In addition to the burglary charge, count III alleged theft in that defendant and his accomplices stole three saddles, three bridles and three pairs of chaps from the tack shed. This same count also alleged that defendant and his accomplices stole three horses.

After saddling and bridling the horses, defendant and his accomplices packed up what supplies and equipment they had, and rode away. Each of the defendants had a firearm, all apparently stolen by them while they were in the State of Nebraska. Defendant Sunday had a 30-30 rifle; accomplice Wilson had a 22.250 rifle; and accomplice Mitchell had a single shot .410 shotgun.

The trial record does not disclose when the McLeans discovered the horses and riding equipment missing. Nor, of course, is there any evidence that they knew the defendant and his accomplices to be armed. The McLeans did not, however, report the thefts to local law enforcement officials. Rather, they armed themselves and struck out after the horse thieves.

We do not know when the McLeans began their search for the stolen horses. The armed confrontation did not take

place until at least a day and a half later, in the late afternoon of September 6, 1977. By this time, defendant and his accomplices had traveled only a few miles from the McLean property. It was then, in the words of the majority opinion, that defendant and his accomplices "saw a pickup truck rapidly approaching. They tried to escape into the trees but were cut off by the pickup. The pickup was driven by Kenneth McLean. His wife was also in the pickup. Kenneth McLean stopped the pickup about sixty-five feet from Sunday, Wilson and the Mitchells." Thus the stage was set for the armed confrontation and shootout.

McLean leaped out of the pickup truck carrying a .308 caliber bolt action rifle, and Mrs. McLean came out armed with a .38 caliber pistol. Defendant Sunday immediately dismounted from his horse. He was armed with a .30-30 rifle. Accomplice Wilson was armed with a .22-250 caliber bolt action rifle, and accomplice Mitchell was armed with a .410 gauge single shot shotgun. Only a few words were exchanged before the gunbattle started.

As Kenneth McLean approached the defendant and his accomplices, he yelled, "What the God Damn hell is going on? What kind of prank is this? Give us our horses, or we will shoot you." Marion McLean added, "Your God Damn right we will." Almost instantaneously with his words, Kenneth McLean operated the bolt mechanism of his rifle and injected a cartridge. This evidence is not disputed.

But a dispute in the testimony arises between what defendant contends Kenneth McLean did and what the accomplices say happened. Defendant Sunday testified that Kenneth McLean pointed his rifle directly at him and that he was "scared as hell." Accomplices Mitchell and Wilson, on the other hand, testified that McLean's rifle was pointed at the ground. In any event, the shooting immediately erupted.

-35-

Defendant fired first and hit Kenneth McLean in the leg. The shooting as described in the majority opinion, continued until both Kenneth McLean and Marion McLean lay dead. Defendant and his accomplices then stole some personal belongings from the McLeans and fled to Oregon in the McLean pickup truck where they were arrested.

It is clear that the State had the requisite probable cause to charge defendant with deliberate homicide ("purposely or knowingly" causing the deaths of Kenneth and Marion McLean). It is equally as clear, however, that the State had no basis to charge defendant with deliberate homicide by application of the felony-murder rule. Indeed, there is not the slightest indication in the record that the defendant was ever put on notice that he must defend against a felony-murder theory.

Defendant gave notice to the State that he would rely on a claim of self-defense as a justification for his actions. The State at no time opposed this claimed defense or contended that defendant had no right to claim self-defense. The record is barren of any indication that the State intended to rely on the felony-murder rule as the theory or one of its theories of prosecution. If the State did intend to use the felony-murder rule, it was a well-guarded secret until the end of the trial when it so cleverly supplied the felony-murder theory to the jury in the form of an instruction.

The majority makes no attempt to analyze the factual context giving rise to the declaration that the felony-murder was properly applied. Rather, the clear implication is that any conduct of the defendant and his accomplices after the commission of the burglary, can be traced back and become causally related to the commission of the burglary. It is not sufficient to glibly declare that defendant committed

-36-

burglary and that the McLeans deaths are causally related to the commission of the burglary. The unusual circumstances existing in this case require that the relative rights of the parties be considered, for these rights are inextricably connected to a determination of whether the felony-murder rule was properly applied here.

To apply the felony-murder rule to this case is to implicitly hold that defendant Sunday, as a matter of law, was precluded from asserting that he was acting in self-defense. If a perpetrator of a proscribed felony contained within the felony-murder statute is to be held criminally responsible for conduct resulting in the deaths of human beings which is causally connected to the commission of the underlying felony, it makes little sense to permit him to rely on a claim of self-defense as a justification of his actions leading to the deaths involved. Within the context of the facts of this case, the McLeans' conduct was sufficient to break the causal link between the commission of the burglary and their tragic deaths. There is no doubt here that defendant Sunday had a right to present a claim of self-defense to the jury. This being so, I fail to see how the State could be entitled to rely on the felony-murder rule.

The McLeans failed to report the horse thefts to a law enforcement agency. Rather, they appointed themselves as a two member vigilante posse. Armed for a confrontation with the horse thieves, they went after them in their pickup truck. The record is barren of any evidence that the McLeans had the intention to bring the horse thieves to justice by using any kind of citizen arrest powers. Rather, they were concerned only with the return of the horses and were willing to use armed force to accomplish that result. With both sides being armed, it appears that a classic western-

-37-

style gunbattle was inevitable.  It was occasioned, however, by the precipitious and unwarranted acts of the McLeans in taking the law into their own hands and using force in that process.

What is the extent to which the McLeans could go in using self-help efforts to secure the return of the horses? And assuming that the McLeans used or threatened to use armed force to secure the return of their horses, what is the extent to which Sunday could resist their armed threats or overt acts which may have led him to believe that his life was in imminent danger?  Did the McLeans have the right to arm themselves and by the use of armed force demand the return of their horses?  Did the McLeans have the right to take such action as would or could lead the defendant or his accomplices to believe their lives to be in imminent danger?

By the same token, the question arises as to the extent to which defendant and his accomplices could defend themselves against the use of force or threats of use of force by the McLeans.  Assuming an overt threatening act by Kenneth McLean with his rifle directed at defendant Sunday, because [was Sunday,] he had stolen the McLeans' horses and riding accessories, required to submit himself to being the victim of a possible homicide?  If Sunday believed his life to be in imminent danger by Kenneth McLean's threat to shoot accompanied by an overt act, did he have a right to defend himself by first shooting McLean?  Assuming an overt act by McLean with his rifle directed at defendant Sunday, did Sunday have the right to defend himself by the use of countervailing armed force?  Only if it can be held as a matter of law that Sunday had no right to defend himself from McLean's threats or overt acts with his rifle, can an application of the felony-murder rule be justified.  Otherwise, defendant Sunday was entitled to present to the jury his claim of self defense.

-38-

The effort of the McLeans to recapture their horses by force of arms was to trigger an armed and deadly response from the defendant and his accomplices. There is no doubt that the McLeans threatened to kill the defendant and his accomplices. Defendant, moreover, testified that he fired only because he believed his own life to be in immediate danger when McLean pointed the loaded rifle at him. While defendant's accomplices, who had turned state's evidence, testified that McLean had pointed his rifle at the ground rather than at the defendant, there is no question that there was a factual picture depicted sufficient to raise a claim of self-defense. If it be conceded that defendant had a right to present his self-defense claim to the jury, it follows that the State was not entitled to encumber and muddy this claim of self-defense by proceeding on a felony-murder theory. The underlying purpose of the felony-murder rule is defeated where a defendant is permitted to rely on a claim of self-defense as justification for his actions.

Once a causal connection is established between the commission or attempt to commit the underlying felony, criminal liability attaches without regard to the defendant's intent to kill. The theory is that certain felonies are so inherently dangerous to human life that a defendant ought not to be able to escape criminal responsibility by proving that in the commission of, attempt to commit, or flight from the commission or attempt to commit the underlying felony, he did not intend to kill. The additional triggering factor of flight has been added by the legislature of this State, and is not within the traditional definition or concept of
                                                                consistent
the felony-murder rule. If the felony-murder rule is to be /

-39-

and to fulfill its underlying purpose, it would also be no defense for the perpetrator to contend that he killed in self-defense. To permit such a defense would destroy the underlying purpose of the felony-murder rule.

Furthermore, a claim of self-defense is patently inconsistent with a felony-murder prosecution. The felony-murder rule does not permit one to escape criminal responsibility by a contention that he did not intend to kill. Although a claim of self-defense does not necessarily result in an admission that the perpetrator actually intended to kill, it does mean that the perpetrator admits the use of deadly force but contends that he was justified on grounds of self-defense. If a causal connection is established between the commission of the underlying felony and the death of a human being, it hardly makes sense to permit the perpetrator to assert that the act of killing was in self-defense.

There are no statutes in this State, and there are no cases decided by this Court which permit of the self-help activities engaged in by the McLeans in seeking the return of their horses. They had no right to use armed force to accomplish this result.

The only statute even remotely applicable is section 46-6-502, MCA, which sets forther the circumstances under which a private citizen can make an arrest. The statute provides in substance that a private citizen can arrest if an offense is committed or attempted in his presence, or if a felony has in fact been committed and he has reasonable grounds to believe that the person arrested committed the offense. The Montana Criminal Law Commission Comment to this statute, sets forth a clear intent to restrict the involvement of private citizens in making unilateral decisions to arrest:

-40-

"The concensus of the commission was that modern law enforcement requires that most arrests be made by police officers and the right of private persons to arrest should be strictly limited."

Even assuming the right of the McLeans to arrest under the authority of this statute, the record is barren of any evidence that they were attempting to effectuate an arrest. Rather, they were interested only in forcing the return of their property at gunpoint. They obviously were willing to engage in a gunfight to accomplish that end.

When the McLeans discovered the thefts, it was clearly their duty to call in law enforcement and let them handle the situation. Their precipitious and foolish action in taking the law into their own hands by force of arms provoked the armed confrontation and shootout which resulted in their tragic deaths. The McLeans actions in arming themselves, tracking down the thieves, and subsequent threats to kill accompanied by the obvious apparent ability to carry out their threats, operated to break any chain of causation between the commission of an underlying felony and the deaths of the McLeans. This was an efficient intervening cause if ever there was one. There being no causal relationship, the felony-murder rule has no application.

Under the facts as testified to by the accomplices who turned State's evidence, and the testimony of the defendant, defendant clearly had a right to present his claim of self-defense to the jury. Although he was a thief, he had no

duty to become a homicide victim by letting the McLeans shoot him first. Whether he was in imminent danger and acted reasonably under the circumstances in shooting first, is a jury question. But if the defendant reasonably believed his life to be in imminent danger because of the threatening use of firearms by the McLeans, he had a right to claim that he was acting in self-defense. The conduct of the McLeans in precipitating the armed confrontation intervened to cut off the application of the felony-murder rule. To hold otherwise is to hold in effect that defendant had no right to present his claim of self-defense to the jury and,/ the majority did not hold that defendant had no right to present a claim of self-defense to the jury.

The felony-murder instruction and possible jury verdict based on that instruction and theory, muddied the waters in relation to defendant's claim of self-defense. He was entitled to present his claim of self-defense free of any contention of the State that he was guilty of deliberate homicide by virtue of the felony-murder rule. For this reason, he is entitled to a new trial on the homicide charges.

I would hold in relation to count III of the theft charges in the same manner as the majority held in count V of the theft charges. I would reverse the burglary conviction for the reason that the tack shed was not an "occupied structure" within the meaning of the statute. For all the reasons stated in relation to the felony-murder instruction, I would grant a new trial to the defendant on the homicide charges with instructions that the felony-murder rule cannot be applied to this case.

_____
Justice

-42-