No. 81-363

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

STATE OF MONTANA,

Plaintiff and Respondent,

vs.

JAMES VERNON WILSON,

Defendant and Appellant.

Appeal from:  District Court of the First Judicial District,
In and for the County of Lewis and Clark
Honorable Peter Meloy, Judge presiding.

Counsel of Record:

For Appellant:

Garrity, Keegan and Brown, Helena, Montana
Thomas Keegan argued, Helena, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Charles Graveley argued, County Attorney, Helena, Montana

Submitted:  February 22, 1982

Decided:  June 7, 1982

Filed: JUN 7 - 1982

_Thomas J. Kearney_
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Appeal by the defendant James Vernon Wilson from an order denying his petition for post-conviction relief in the District Court, First Judicial District, Lewis and Clark County.

Wilson was charged in District Court under an amended information with five criminal counts: Count 1, that on September 6, 1977, he committed the offense of deliberate homicide by purposely or knowingly causing the death of Kenneth McLean, or that he was accountable for that death; Count 2, that on the same date he committed the offense of deliberate homicide by purposely or knowingly causing the death of Marion McLean; Count 3, that on September 5, 1977, he had committed the offense of felony theft; Count 4, that on September 4, 1977, he had committed felony burglary; and Count 5, that he had committed on September 6, 1977, a further offense of felony theft.

The charges against Wilson stemmed from a journey of criminal activities that began in Nebraska on or about September 1, 1977, extended into Texas, back to Nebraska; thence north to a lonely mountain setting near Lincoln, Montana, where Kenneth and Marion McLean were killed; and thence in flight to Portland, Oregon, where, on September 10, 1977, Wilson with his companions Andrew Sunday and Donna Mitchel was arrested.

Following his arrest, an information against Wilson including five felony counts was filed, and at his arraignment, Wilson pleaded not guilty. The information was amended a first time and Wilson's not guilty plea continued. Because Wilson was indigent, the District Court appointed two members

-2-

of the Lewis and Clark County Bar, David N. Hull, and Thomas Keegan, to defend him. It was as a result of a motion by these counsel for a more specific charge that the amended information of January 24, 1978 was filed, which included in Count I a felony murder charge, that involving the death of Kenneth McLean.

On January 19, 1978, however, James Wilson had written to the presiding district judge, asking permission to talk to the county attorney without his court-appointed counsel being present. Thereafter, at the time for his arraignment on the second amended information, Wilson appeared before the District Court on January 30, 1980, accompanied by both of his appointed counsel.

Wilson's first appearance before the court that day was at 9:30 a.m. The court advised Wilson in the presence of his counsel that he did not have to make any statements or answer any question which might incriminate him and that if he did, his statements could be used against him in a trial. He was told of the charges against him and the possible punishments that were imposed by law on those charges. The following colloquy between court, the counsel and Wilson occurred.

> ". . . You should also be advised that on a finding of guilty or a plea of guilty it is possible that a jury could find you or a judge could find you guilty of a lesser included offense. Mr. Graveley, what would be the lesser included offenses?
>
> "MR. GRAVELEY: Your Honor, if the proper instructions were submitted to a jury or the judge if tried to the court, I believe a lesser included -- the only lesser included offense possible in the fact situation we have would be mitigated deliberate homicide.
>
> "THE COURT: What about negligent homicide?
>
> "MR. GRAVELEY: I see no way negligent homicide could apply. I have conferred with defense counsel concerning this and as I recall they are in agreement with me that negligent homicide could not fit in the facts we have.

-3-

"THE COURT: Mr. Keegan?

"MR. KEEGAN: That is correct, Your Honor. One further lesser included offense possible is aggravated assault.

"THE COURT: Very well. Understand then, Mr. Wilson, that although you are charged with these deliberate homicides, it is possible that you could be convicted of a lesser included offense, mitigated homicide or aggravated assault.

"A. Yes, sir."

The District Court then proceeded to instruct him as to his rights if he decided to go through with a trial by jury, attended by counsel. The court ascertained from his court-appointed counsel that Wilson was fully advised of all of his constitutional and statutory rights. Wilson further told the court that he was satisfied with the advice his counsel had given to him as to his rights. Wilson further stated that he was in a mental and physical condition to enter a plea and both his counsel told the court that they saw no mental or physical reason why Wilson was not capable of entering his plea. On that basis, the court asked Wilson what his plea would be, taking the separate counts, and to each Wilson stated he was guilty, except as to Count IV, the burglary charge.

At this point, in the presence of Wilson, the court-appointed counsel spoke up to express their objections. The following colloquy occurred:

"MR. HULL: No, Your Honor. Also at this time on behalf of my co-counsel we wish to advise the Court that this plea is entered against the advice of counsel. We have discussed it thoroughly with our client and just want it on the record that both co-counsel believe that this is not a proper plea and this plea is made against our advice.

"MR. KEEGAN: Further we would urge the Court at this time, Your Honor, not to accept the plea, but to take it under advisement at this time.

"THE COURT: Well, Mr. Wilson, your attorneys have advised you not to plead guilty to these offenses

-4-

and I want to know whether or not it is your feeling at this time that you want to plead guilty to these offenses despite the advice given by your counsel?

"A. Yes, Your Honor."

The court thereupon took the matter of accepting the pleas of guilty under advisement.

Then, on the same morning, at 10:15 a.m., Wilson, both of his appointed counsel, and the county attorney appeared again before the district judge. The district judge began the discussion by stating "[i]t is my understanding, Mr. Wilson, that you requested to talk to the Court in chambers. Is that correct?" Mr. Wilson replied, "Yes, Your Honor." His counsel were asked for their objection and they stated their same objections, that they opposed his entry of pleas of guilty to the four counts, and that they had advised him of his rights to remain silent. The court again told Mr. Wilson that anything that he might say that incriminated him could be used against him in a trial if the court refused to accept the plea of guilty. On that basis, the District Court said, "All right, Mr. Wilson, go ahead and tell me what you want to say." Upon being sworn, Wilson then told in full his version of the events leading up to the deaths of the two McLeans.

Omitting all of the detail of the odyssey of the trio (and Donna Mitchel's small child) from Nebraska to Montana, we come to the point in Wilson's statement to the court where the McLeans, riding in a pickup, arrived at the place in the mountains where Sunday, Wilson, Donna Mitchel and the small child were riding on horses. On the approach of the McLeans, Wilson told the court the following occurred:

-5-

". . . And I told Sunday then to get -- not right then, because the pickup was nearly there when this happened, because I told him to get off his horse and talk to the people. And he had the 30.30 across his saddle, you know, laying across his lap. And he got off his horse and he was standing there, you know, and as the truck started to pull up, he tries to hand me the 30.30 and said, 'Do you want the privilege?' And I told him then to just talk to the people, you know, see what they wanted. We pretty well know they were after the horses, but -- Mr. McLean got out of the truck. Mrs. McLean got out. I didn't see Mrs. McLean with a gun at the time, but I seen Mr. McLean's gun. Mr. McLean got out of the truck, cocked his gun. About the same time he was cocking his gun, he said, 'What is this bullshit? What kind of a prank do you think you are pulling?' Something like that. As he did that, he started walking forward and Sunday shot him and Mr. McLean fell on the ground and I had the baby in the saddle with me. I whipped the horse and started riding away. I didn't even see Donna. I didn't even know where she was at. I started riding away, I don't know, 20 - 30 feet out. I don't know how far it was, but I stopped -- I got the baby -- on the way out I heard a bullet go by my head. I figured it was a bullet. You know, I can't swear to it, but I heard something that sounded to me like a bullet, to me. But, I got Sissy out and grabbed her by the arm and pulled her off the horse and layed her down on the ground and I couldn't get off the horse by throwing my leg behind the horse. I had to throw it over the horse and the baby was screaming for her mother, saying, 'Mommy, the woman shot at me.' And when I got off my horse I just -- I had the 22.250 tied to the side of the saddle with pigging string and I just jerked it. And as I started running, I just ran. I run past the woman and I just seen a movement and turned and fired and I walked on over where Sunday was. . ."

The person at whom Wilson had fired his rifle was Marion McLean. Five months later, Wilson testified at the trial of Andrew Sunday. His testimony (of which we take judicial notice) included the following statements:

"A. I seen the first shot. I seen Mr. McLean fall.

"Q. Where did it go? A. Hit Mr. McLean in the leg.

"Q. Then what happened? A. Mr. McLean fell and I turned my horse and ran.

"Q. Did you hear him say anything? A. I heard Mr. McLean say, 'You son of a bitch.'

"Q. And you turned your horse? A. And I ran. Had the baby on there with me.

"Q. Where did you go? A. About, maybe, 50 or 60 feet from where it started.

"Q. Where was Donna at this time? A. Donna was on the ground. At the time I stopped the horse, I didn't know where she was at until I stopped the horse.

"Q. How far did you go with the horse? A. Maybe 50 or 60 feet from where it started.

"Q. What did you do there? A. I took the baby by the arm and leaned over the saddle and laid her on the ground.

"Q. Then what did you do? A. I got off the horse?

"Q. How did you get off the horse? A. Swung my leg over the front of the horse. Couldn't get off any other way.

"Q. You have a weapon in your hands? A. At that time, no, sir.

"Q. You said you started to yell and Donna-- what did you say? A. I told Donna to get the hell over here and get the baby and get out of here.

"Q. Then what? A. I got off the horse and I was trying to untie the gun off the saddle. I had it tied on the side.

"Q. Did you hear anything in the time period that you turned your horse and dropped the baby off? A. Shooting.

"Q. How much shooting? A. Quite a bit.

"Q. Do you have any idea of the number of shots? A. Ten or fifteen shots at least.

"Q. Okay. A. Hard to judge.

"Q. And as you were untying the gun--what gun did you have? A. A 22.250.

"Q. Did you get it untied? A. No, sir. I jerked it loose.

"Q. Then what did you do? A. I turned and started back towards where the McLeans were.

"Q. Where was Sunday at this time? A. He was walking towards Mr. McLean. Mr. McLean was on the ground.

-7-

"Q. Did the defendant fire any shots after you had your gun in your hands? A. No, he didn't.

"Q. What did you do as you were approaching? A. I was walking by and I didn't know where Mrs. McLean was and as I went by I seen a movement and I just turned and fired.

"Q. Do you know what happened with the bullet? A. Yes. It hit Mrs. McLean in the face."

Wilson was sentenced to 100 years on Count I (Kenneth McLean), 100 years on Count II (Marion McLean), 10 years on Count III (theft), and 10 years on the remaining Count (theft). The sentences are to run concurrently.

Following his judgment of conviction and sentence, Wilson sought review of his sentence through the Sentence Review Division. Sentence review was denied on May 12, 1978.

On July 28, 1980, he filed his petition for post-conviction relief before the District Court seeking to withdraw his guilty pleas. After a hearing, and having received briefs from counsel, the District Court entered its findings of fact, conclusions of law and order denying the petition for post-conviction relief on January 26, 1981. It is from this order of denial that Wilson here appeals.

We affirm the decision of the District Court.

Counsel for Wilson contend on appeal (1) that plaintiff's guilty plea does not represent a voluntary and intelligent choice among alternative courses of action open to him as affirmatively disclosed by the record, and further, (2) that the District Court erred in accepting Wilson's guilty plea without first determining his competence to plead.

The basis of the first issue raised by counsel for Wilson is that the District Court did not explain to Wilson, or determine from him whether he understood the differing

-8-

elements and effects of homicide and mitigated deliberate homicide; that Wilson was never apprised of the difference between those two crimes, nor was accountability or felony murder ever explained to him. They further contend he was coerced into pleading guilty by his girlfriend, Donna Mitchel, who played upon his blind love for her so that he would enter a guilty plea; that he was forced to look at gruesome pictures of the decedents by members of the sheriff's office, and that he was terrified of hanging.

We have said that each case involving a motion to withdraw a plea of guilty must be examined on its own record inasmuch as no set rule or standard can be relied on in any given case. State v. Huttinger (1979), ___ Mont. ___, 595 P.2d 363, 366, 36 St.Rep. 945. It is the policy of the law, if justice will be subserved, to permit withdrawals of guilty pleas even after judgment. State v. District Court (1928), 81 Mont. 495, 502, 263 P. 979, 981. Further, all doubts should be resolved in favor of a trial on the merits and the trial court's discretion should be liberally exercised in favor of life and liberty. State v. McAllister (1934), 96 Mont. 348, 353, 30 P.2d 821, 823.

On the other hand, when at the hearing to enter a plea, the District Court carefully examines the defendant, finds him to be competent, and determines from him that his plea of guilty is voluntary, that he understands the charges and his possible punishment, that he is not acting under the influence of drugs or alcohol, that he admits his counsel is competent and he has been well advised, and he declares in open court facts upon which his guilt is based, then a plea of guilty accepted by the District Court on the basis of that examination will be upheld. State v. Lewis (1978), 177

-9-

Mont. 474, 484-85, 582 P.2d 346, 352.

In any event, the grant or denial of a motion to withdraw a plea of guilty is within the sound discretion of the trial court. Matter of Hardy (1980), ___ Mont. ___, 614 P.2d 528, 531, 37 St.Rep. 1358. A denial of a request to withdraw a guilty plea is subject to review only when there has been an abuse of discretion by the trial court. State v. Hilton (1979), ___ Mont. ___, 597 P.2d 1171, 1173, 36 St.Rep. 1314.

In this case, there is no showing that his plea of guilty is caused by ignorance or lack of understanding. It is certain that no duress was used or fraud perpetrated upon him. There was no evidence of any influence overreaching his free will or judgment. In fact this case has a novel twist. We held in State v. McAllister, supra, where the defendant's guilty plea was based on reliance on his counsel's representation as to what his sentence would be, that refusal to permit withdrawal of his guilty plea was an abuse of discretion. Here we have the other side of the coin: Wilson persisted in pleading guilty in spite of his counsel, present in court, who insisted that he should not plead guilty.

It is true that in State v. Azure (1977), 175 Mont. 189, 573 P.2d 179, this Court invalidated a guilty plea where the District Court did not determine whether defendant understood the differing elements and effects of a deliberate homicide and mitigated deliberate homicide. In Azure, the defendant, after entering his guilty plea, sought to withdraw the plea because he felt he was not fully responsible for his actions on the night of the shooting due to intoxication and emotional depression. Azure entered his plea of guilty on September 14, 1976, and sought to revoke it sometime

-10-

before September 28, 1976.

Here Wilson substantially delayed his motion to withdraw his guilty pleas, which was part of a plea bargain he initiated himself. The failure of the court to explain the differences between deliberate homicide, mitigated homicide and aggravated assault resulted in no prejudice to Wilson. His voluntary statement to the court clearly showed he was an accomplice in Kenneth's deliberate homicide, and he was the perpetrator of Marion's deliberate homicide. Counsel for Wilson rely upon an answer made by Wilson to a question by his counsel as to whether "in your mind, Jim, were you in any way involved in the death of Mr. McLean?" Wilson's answer was "No, sir." Yet, it is clear that Wilson's statement to the court at the time of his entry of plea belies any contention he might make that he was not "involved" in the death of Kenneth McLean. He was directly and fully involved in the course of many criminal acts, all surrounding, leading up to or involving McLean's death, even though Wilson didn't actually pull the trigger to fire the shot that killed McLean.

With respect to the death of Mrs. McLean, he fired a shot which hit her in the face, though she had been shot earlier by Sunday. (See other facts surrounding this incident in State v. Sunday (1980), ___ Mont. ___, 609 P.2d 1188, 37 St.Rep. 561.) In accepting Wilson's plea of guilty to deliberate homicide with respect to Marion McLean, the court was agreeing that the facts related by Wilson constituted deliberate homicide. Further, the District Court in denying the petition for post-conviction relief, continued to rely on the same line of reasoning as far as Marion McLean is concerned. We are certainly not prepared to say the District Court is

-11-

in error on this point.  When the shooting started, Wilson
took evasive action, but stopped in about 60 feet.  He got off
his horse, jerked the rifle from the side of the horse, and
returned to the scene of action.  He fired a shot into
Marion McLean's face merely upon seeing her move.  Clearly,
the District Court was not in error in deciding that Wilson
committed deliberate homicide with respect to Mrs. McLean.

Counsel for Wilson base their second issue, whether the
court should have determined Wilson's competency to plead,
upon such factors as his withdrawal of a notice that he
intended to rely on mental disease or defect as a defense,
and that his withdrawal of notice was just before he would be
transported to Warm Springs, Montana, for psychiatric testing.
Another factor claimed is that Wilson wrote a letter to the
District Court asking to confer with the county attorney
outside the presence of defense counsel.  These factors, and
the fact that the plaintiff pleaded guilty against the
advice of his own counsel are, counsel contend, sufficient
to put the District Court on inquiry as to his competency.

Since Wilson outlined the facts of the crimes to the
District Court at the time of entry of his plea, and five
months later gave substantially the same testimony at the
trial of Andrew Sunday, it seems clear that he was fully
possessed of his mental faculties at all times we are concerned
with here.  It would have been sheer speculation on the
part of the District Court, based on the factors relied upon
by Wilson's counsel, to conclude that Wilson was not competent
to understand what he was doing when he entered his pleas
of guilty.  There is no substantial foundation in the record
for a court to suppose other than that Wilson fully knew
what he was doing when he decided to place himself at the
court's mercy by telling all.

-12-

The record supports the District Court's finding that the defendant was mentally and physically competent to plead to the charges and that he remains mentally and physically competent.

We therefore affirm denial of post-conviction relief by the District Court.

_____
                              Justice

We Concur:

_____
          Chief Justice

_____

_____
              Justices

_____
Hon. Joel. G. Roth,
District Judge, sitting
for Mr. Justice Frank B.
Morrison, deeming himself
disqualified

_____
Hon. Mark Sullivan,
District Judge, sitting
for Mr. Justice Fred J.
Weber, deeming himself
disqualified

Mr. Justice Daniel J. Shea dissents and will file a written dissent later.

-13-