[No. 2685-2. Division Two. May 23, 1978.]

THE STATE OF WASHINGTON, *Respondent,* v. RICHARD MARK FREDERICK, *Appellant.*

*Philip DeTurk,* for appellant (appointed counsel for appeal).

*Don Herron, Prosecuting Attorney,* and *Joseph D. Mladinov, Senior Deputy,* for respondent.

PEARSON, C.J.—On August 4, 1976, Richard Frederick, a 16–year–old high school student, deliberately shot and killed Steven Tisdale, age 24. Frederick was convicted by a jury of first–degree murder. He appeals from that conviction and raises the following issues:

1. Whether the trial court abused its discretion by refusing defense counsel's request to interview prospective jurors individually outside the presence of other jurors, regarding their exposure to pretrial publicity.

2. Whether an amendment to the information after the defense had rested its case prejudiced defendant.

3. Whether there was evidence that defendant acted in the "heat of passion" when he killed the victim, such that the jury should have been instructed on the lesser–included offense of second–degree murder. Our analysis of the issues leads us to reject the defendant's assignments of error and affirm the judgment of the trial court.

The facts of the case are essentially undisputed. Richard Frederick had long desired to own a Camaro automobile. A gas station attendant, who was a friend of Frederick's and who knew that he wanted to buy a Camaro, told Frederick that he would introduce him to Steven Tisdale, who was trying to sell a Camaro. On August 3, Frederick stopped by the gas station, met Tisdale, and went for a ride with him in the Camaro. Frederick asserted that during this ride Tisdale stopped the car in a deserted area, told him to get in the back seat and remove his pants, and then forced him to participate in an act of sodomy. Subsequently, he and Tisdale drove back to the gas station so that he could pick up his car. Frederick said he stayed at the gas station talking to Tisdale for about 15 to 30 minutes, wrote down Tisdale's name and phone number, and told him that he was interested in buying the car. The gas station attendant stated that Frederick's conversation with Tisdale was ordinary, that there appeared to be no animosity between them, and that their behavior was not any different from the way they acted before they went out on the drive.

As Frederick drove away from the gas station, he passed Tisdale's car somewhere along South Tacoma Way. Frederick rolled down his window and asked Tisdale to follow him to his house, so that he could show the car to his girl friend. Tisdale agreed and went to Frederick's house. Frederick's girl friend testified that after Tisdale left,

Frederick told her that he was going to kill Tisdale in order to get his car.[1]

The following day, Frederick borrowed a .22-caliber pistol and three bullets from a high school friend on the pretense that he was going to shoot a dog that bothered him. Frederick called Tisdale's home to arrange a meeting, but Tisdale was not at home. Tisdale's wife told Frederick to call back later, which he did. Upon reaching Tisdale, he told him that he was ready to buy the Camaro and invited Tisdale to come over to his house.

Tisdale arrived around 6 p.m. and took Frederick for a ride in the car. At some point, Frederick told Tisdale that he would like to show the car to another friend, and asked if he could drive the car. Tisdale agreed, and he and Frederick switched seats. Once Tisdale got into the passenger's seat, Frederick pulled out the gun which he kept ready in his pocket, reached in from the driver's side, and put three shots in Tisdale's left side or back. He then hit Tisdale on the head with the gun to make sure he was dead, pushed Tisdale's body down in the seat, and drove home.

At his house, Frederick and his girl friend took the body out of the front seat and put it in the trunk. They changed clothes and drove to an area near Mt. Tahoma High School, where they threw the body into brush and covered it with straw. They drove back to Frederick's house and parked the car in a vacant lot. Again they removed their blood-soaked clothes and the girl friend washed them. Frederick took a shower and then went out and washed the car at a car wash. Defendant carefully destroyed the contents of Tisdale's wallet and threw the wallet away. He then took the title and registration out of the car and hid them in his room. The next day he removed the bloodstained carpeting

---

[1]Frederick testified that he didn't remember whether he told his girl friend that he was going to kill Tisdale, but he conceded that he might have done so. He also stated that he did not tell his girl friend or anyone else about the alleged sodomy incident.

from the car and arranged to store the car in a friend's garage. For several days, Frederick drove the car around Tacoma telling friends that he bought it from a soldier at Ft. Lewis.

On August 6 the Tacoma News Tribune carried the story and reported that Steven Tisdale had been reported missing, that his car had been found with bloodstains in it, that an unnamed 16–year–old youth had been arrested, and that the police were conducting tests on the bloodstains. During the next 4 weeks, the News Tribune carried seven more news stories relating to the case. Only in the last two stories was defendant's name mentioned and his picture was printed only once. All of the articles were relatively short and contained the barest facts, *e.g.*, discovery of the body, decision to try the accused as an adult, and filing of murder charges.

 Defense counsel contended that because of the pretrial publicity he should have been permitted to voir dire prospective jurors in the manner set forth in ABA Standards, Fair Trial and Free Press § 3.4(a) (Approved Draft, 1968):

> Whenever there is believed to be a significant possibility that individual talesmen will be ineligible to serve because of exposure to potentially prejudicial material, the examination of each juror with respect to his exposure shall take place outside the presence of other chosen and prospective jurors. An accurate record of this examination shall be kept, by court reporter or tape recording whenever possible. The questioning shall be conducted for the purpose of determining what the prospective juror has read and heard about the case and how his exposure has affected his attitude towards the trial, not to convince him that he would be derelict in his duty if he could not cast aside any preconceptions he might have.

We have previously recognized this procedure, but found it unnecessary where the news stories contained

> factually accurate material of a relatively nonsensational nature and, for the most part, told the public (prior to trial) only those basically essential facts of the crimes

which would ultimately be presented to the jurors in the controlled atmosphere of the courtroom.

*State v. Wilson*, 16 Wn. App. 348, 354, 555 P.2d 1375 (1976).[2]

In the case at bench, none of the information contained in the News Tribune stories appears to violate the Washington Bench–Bar–Press Guidelines. Because of their general innocuous character, it cannot be said that there was a "significant possibility" that potential jurors would not be able to serve because of "potentially prejudicial" publicity. The trial court did not abuse its discretion in refusing defense counsel's motion. *State v. Wilson, supra* at 355.[3]

Defendant's second contention relates to the trial court's decision to permit the information to be amended on the prosecutor's motion after the defense had rested. The Superior Court Criminal Rules state that

---

[2]The commentary to the ABA Standards, Fair Trial and Free Press states at pages 17, 25–40 (Approved Draft, 1968) that the rules regarding pretrial publicity are generally designed to apply in situations where potential jurors have been exposed to information, evidence, or opinions which might not be admissible at trial.

The right to a fair trial may thus be substantially endangered by public statements or by reporting prior to trial going beyond a factual description of the person arrested and of the crime charged and a factual statement of the arrest and surrounding circumstances. The danger is especially acute when public statements or reporting extend to such matters as confessions or admissions, prior history, or the performing of tests or refusal to submit to a test; opinions about guilt or innocence; interviews of prospective witnesses; interviews of the defendant before he has had an opportunity to consult with counsel; and speculation as to the plea to be entered or the evidence or testimony to be introduced at the trial. The release and publication of photographs when identification is a matter in dispute may cause particular difficulty, as may reiteration of any earlier detailed reports as the time of trial approaches.

[3]Of the 14 jurors who served (12 plus 2 alternates), only 3 definitely recalled reading about the case in the newspaper. Nine jurors said they either had not read any of the news stories or vaguely recalled reading something about it. Two jurors were never even asked whether they had read any reports about the case. Furthermore, we note that the defense used only five of its six peremptory challenges.

[t]he court may permit any information to be amended at any time before verdict or finding if substantial rights of the defendant are not prejudiced.

CrR 2.1(d).

The original information, filed on August 31, 1976, charged Frederick with premeditated murder or, in the alternative, felony–murder. Either charge amounts to murder in the first degree. RCW 9A.32.030(1)(a), (c). Prior to trial, the prosecution was permitted to amend the information by deleting the premeditated murder charge. The trial court, however, indicated that the premeditated charge could be put back in the information if defendant testified at trial, as his counsel indicated he would, that he deliberately killed the victim, but not for the purpose of stealing the victim's car. The court commented that it would be ludicrous to allow the defendant to avoid conviction of first–degree murder because he denied felony–murder, but in effect admitted premeditated murder. The court stated that if defendant's testimony provided evidence from which a jury could find that the homicide was premeditated, the court would entertain a motion to amend the information back to its original form. Defendant subsequently testified as his counsel predicted, and the trial court granted the prosecution's motion to amend the information. Defense counsel objected to the amendment, but did not move to reopen his case.

On appeal, Frederick contends that the amendment deprived him of his right to be informed of the charges against him. Const. art. 1, § 22 (amend. 10); *see State v. East,* 3 Wn. App. 128, 474 P.2d 582 (1970). But in view of the trial court's admonition to defense counsel prior to trial that he would consider amending the information, defendant cannot claim surprise or prejudice. *State v. Estill,* 50 Wn.2d 245, 310 P.2d 885 (1957); *see State v. Brown,* 74 Wn.2d 799, 447 P.2d 82 (1968). The trial court did not abuse its discretion under CrR 2.1(d) in permitting the information to be amended.

■ Finally, Frederick asks us to consider whether the trial court erred in refusing his proposed instructions on provocation and second–degree murder. *See* RCW 9A.32-.050. It is clear that evidence of provocation will justify a second–degree murder instruction because it serves to negate premeditation. *See Smith v. State,* 314 So. 2d 226, 232–33 (Fla. Dist. Ct. App. 1975). However, it is equally clear that the trial court need not give a second–degree murder instruction unless there is evidence to support such an instruction. *State v. Anderson,* 10 Wn.2d 167, 116 P.2d 346 (1941).

■ The rule of provocation has four requirements:

1. There must have been adequate or reasonable provocation.

2. The defendant must have been in fact provoked, and, if provoked, did not in fact cool off.

3. The circumstances are such that a reasonable person would not have cooled off.

4. There must have been a causal connection between the provocation, the heated passion, and the fatal act. *See* W. LaFave & A. Scott, *Handbook on Criminal Law* § 76, at 573 (1972); R. Perkins, *Criminal Law* 53–54 (2d ed. 1969).

We assume, without deciding, that there is sufficient evidence that the defendant was sexually assaulted and that a reasonable person would consider such an assault an act of provocation. Our inquiry then is whether Frederick acted in the heat of passion when he killed Steven Tisdale.

The second requirement is a subjective test, *i.e.,* a court must determine whether the actions of a particular defendant manifest deliberation or whether they manifest provocation. *People v. Morse,* 70 Cal. 2d 711, 452 P.2d 607, 621, 76 Cal. Rptr. 391, 405 (1969). In this case, defendant's actions prior and subsequent to the murder demonstrate that he acted deliberately rather than as a result of provocation.[4]

---

[4]Frederick's testimony as to his state of mind prior to the murder was very brief. On direct examination, Frederick was asked about his feeling after the alleged act of sodomy had been committed upon him.

The gas station attendant, who saw Frederick minutes after he returned from riding with Tisdale, said that Frederick appeared emotionally unchanged. Frederick himself admitted that he calmly stayed at the gas station for 15 to 30 minutes talking to Tisdale. When he left the gas station he had the presence of mind to stop Tisdale and invite him to his house that evening so that Tisdale would know where to locate him in the future. The following day he arranged to borrow a gun and then made two phone calls to Tisdale to set up a meeting. He talked Tisdale into driving him to a secluded area and then switched seats with him, thus making it easy for him to shoot Tisdale unobserved and drive the car away. For every action, Frederick had prepared a convenient excuse or pretext. Following the murder, he took careful steps to conceal the body, destroy evidence of identification, and clean up the car for his own use. These facts simply do not support Frederick's contention that he killed Tisdale in a "heat of passion." On the contrary, they indicate that the murder was calculated and unprovoked. Frederick's statement that he wanted revenge is not relevant; revenge is not adequate provocation. *People v. Morse, supra; State v. Ward,* 286 N.C. 304, 210 S.E.2d 407 (1974).

 Even if we assume that Frederick murdered Tisdale in the heat of passion, defendant fails to satisfy the third requirement of the rule of provocation, namely, that a reasonable person would not have cooled off in the time between the act of provocation and the murder. Twenty-

DEFENSE COUNSEL: Well, how did it feel to you?
FREDERICK: Well, not good, I didn't like it.
DEFENSE COUNSEL: Did it—okay, did it pain you?
FREDERICK: Yes.

Later Frederick was asked why he invited the victim to stop by his house when he passed the victim while driving home from the gas station after their first meeting.

DEFENSE COUNSEL: Why did you want him to know where you lived?
FREDERICK: Because I wanted him to come over to the house maybe the next day.
DEFENSE COUNSEL: Why did you want him to meet you the next day?
FREDERICK: Because I wanted revenge.

three hours intervened between the time Frederick was allegedly sexually assaulted and the time he murdered Tisdale. During that time Frederick was completely removed from Tisdale's influence, and no other provoking acts intervened. As a matter of law, a reasonable person would have cooled off under these circumstances. *See In re Fraley*, 3 Okla. Crim. 719, 109 P. 295 (1910).

Because the defendant failed to satisfy at least two of the requirements of the rule of provocation, the trial court was correct in concluding that there was no credible evidence to support an instruction on provocation or an instruction on the lesser–included offense of second–degree murder.

The judgment of the trial court is affirmed.

PETRIE, J., and JOHNSON, J. Pro Tem., concur.

Reconsideration denied June 29, 1978.

Review denied by Supreme Court November 17, 1978.