No. 86-16

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

---

STATE OF MONTANA,

 Plaintiff and Respondent,

-vs-

DONALD BOONE NICHOLS,

 Defendant and Appellant.

---

APPEAL FROM: District Court of the Fifth Judicial District,
In and for the County of Madison,
The Honorable Frank Davis, Judge presiding.

COUNSEL OF RECORD:

 For Appellant:

 Donald E. White argued, Bozeman, Montana

 For Respondent:

 Hon. Mike Greely, Attorney General, Helena, Montana
Judy Browning argued, Asst. Atty. General, Helena
Marc Racicot, Asst. Atty. General, Special Deputy
County Atty. for Madison County, Helena, Montana
John P. Connor, Jr., County Attorney, Boulder,
Montana

---

Submitted:  January 13, 1987

Decided:  March 4, 1987

Filed: MAR 4 - 1987

*Ethel M. Harrison*

Clerk

Mr. Justice Frank B. Morrison, Jr. delivered the Opinion of the Court.

Defendant, Donald Boone Nichols was convicted of aggravated assault, kidnapping and deliberate homicide in the Fifth Judicial District Court of the State of Montana. He appeals the convictions. We affirm.

Appellant and his son, Dan Nichols, began residing permanently in the mountains of southwestern Montana in August of 1983. On July 15, 1984, the Nichols encountered Kari Swenson jogging on a trail near Big Sky, Montana. After a brief conversation, appellant grabbed Kari by her wrists and tied them with a rope. Kari was then bound by a chain to a tree. Numerous individuals searched for Kari. On the morning of July 16, 1984, Jim Schwalbe and Alan Goldstein located the Nichols' camp. They entered the camp in an attempt to rescue Kari. Subsequent events culminated in the death of Alan Goldstein and the fleeing of the Nichols. Kari, who had been wounded, was abandoned by the Nichols and rescued later that day. The Nichols were not apprehended until December of 1984.

Numerous charges were filed against both Nichols. Appellant was charged with the kidnapping of Kari Swenson, the aggravated assault of Jim Schwalbe and the deliberate homicide of Alan Goldstein. The jury was instructed as to the elements of each offense. Appellant's testimony at trial establishes the occurrence of every element of each offense.

The offense of kidnapping is committed if a person "knowingly or purposely and without lawful authority restrains another person by either secreting or holding him in a place of isolation or by using or threatening to use physical force." Section 45-5-302(1), MCA.

2

Appellant admitted to restraining Kari, keeping her in an isolated location, and using and threatening to use physical force to do so.

Q. (By Mr. Racicot) Now, there's no question, is there, that on July 15, 1984, that you restrained Kari Swenson?

A. No.

Tr. Vol. III, p. 116, ln. 18-20.

Q. (By Mr. Racicot) And there's no question, is there, that you restrained her and held her or secreted her in a place of isolation by using physical force?

A. Yes.

Q. And there's no question, is there in your mind, that you did those things knowingly?

A. This physical force thing was more intimidation than anything else, but we did use some force, yes.

Tr. Vol. III, p. 117, ln. 22-25; p. 118, ln. 1-5.

Q. (By Mr. Racicot) At some point in time, did you tell Kari Swenson that she'd better not scream or you'd give her a couple black eyes and it didn't make any difference to you whether or not she was a woman?

A. No. The only--in my original--when I was talking to her, all these questions, I told her were important. I said that, "Try--we'll all try to make everything smooth, and if you don't cooperate, I'm going to give you two black eyes."

Tr. Vol. III, p. 167, ln. 16-25.

The relevant statute with respect to aggravated assault, § 45-5-202(1)(c), MCA (1983), provides:

Aggravated assault. (1) A person commits the offense of aggravated assault if he purposely or knowingly causes:
. . .
(c) reasonable apprehension of serious bodily injury in another by use of a weapon.

3

On direct examination, appellant admitted that when Jim Schwalbe came running toward him after the shooting of Alan Goldstein, appellant placed another shell in the chamber of his rifle, causing Schwalbe to turn and run into the bushes. See Volume III of the transcript, pages 105 and 106. During cross-examination, appellant again recounted his actions.

> A. . . .
>
> I wasn't threatened by the voice because I wasn't worried about him until he started running toward me. But he just hollered real loud, "You're surrounded by two hundred men. You can't get away." And then he ran toward me real fast.
>
> Q. Then he ran back at you?
>
> A. Yes, as soon as he said that, he ran right toward me.
>
> Q. And you pumped one in the chamber, and he saw that?
>
> A. Yes.
>
> Q. You were ready to shoot him, too, weren't you?
>
> A. I would have shot him, you [sic] damn right.

Tr. Vol. III, p. 210, ln. 13-24.

> A. . . . He swerved right at me. And there he saw me put the shell in and then he swerved, and then he went there as far--about as far as to the railing and stopped and looked at me a couple seconds.
>
> Q. No question in your mind that you're convinced he saw you put that shell in the chamber?
>
> A. I don't know why he would have swerved otherwise. I did it quick, and he was running right at me. He had to have seen me do it.

Tr. Vol. III, p. 213, ln. 20-25; p. 214, ln. 1-4.

4

Jim Schwalbe had previously testified that appellant had trained his rifle on him and that he feared he would be shot. Tr. Vol. III, p. 166, ln. 23-25; p. 167, ln. 1-6. This undisputed testimony, together with the testimony of appellant, supports a conclusion that appellant created a reasonable apprehension of serious bodily injury in Schwalbe.

Finally, the statutes under which appellant was convicted of deliberate homicide, the felony-homicide statutes, state:

45-5-101. Criminal homicide. (1) A person commits the offense of criminal homicide if he purposely, knowingly, or negligently causes the death of another human being.

45-5-102. Deliberate homicide. (1) Except as provided in 45-5-103(1), criminal homicide constitutes deliberate homicide if:

. . .

(b) it is committed while the offender is engaged in or is an accomplice in the commission of, an attempt to commit, or flight after committing or attempting to commit robbery, sexual intercourse without consent, arson, burglary, kidnapping, felonious escape, or any other felony which involves the use or threat of physical force or violence against any individual.

There is no doubt from the preceding testimony that the offense of kidnapping and the offense of aggravated assault were committed. During the commission of those crimes, Alan Goldstein was shot and killed. Appellant testified that he shot Goldstein. Tr. Vol. III, p. 104, ln. 7-9. He further admitted that although he was but one cause of Goldstein's death, he was the illegal cause.

Q. (By Mr. Racicot) Now, there's no question in your mind, is there, that you caused the death of Alan Goldstein?

A. There is a question, yes. That's part of the equation. My part was the illegal part. It was

5

the part of the equation. This world isn't that simple.

Q. It's not apparently as simple as you'd like to make it.

A. I no more caused his death than he caused it or the sun had risen that morning that caused it. It was just part of the equation, the illegal part, that I admit was illegal.

Q. And you admitted that the gun that you shot killed Alan Goldstein?

A. Yes, I did.

Q. So in that sense you put it into place--or into play the events and the physical force that took his life?

A. I put in the illegal part, yes.

Tr. Vol. III, p. 120, ln. 4-22.

Thus, even viewing the evidence in the light most favorable to appellant, as we are required to do, there is sufficient evidence on which to sustain the convictions. However, the issues raised on appeal do not concern the sufficiency of the evidence. They focus rather upon the pre-trial publicity, the conduction of voir dire and the constitutionality of Montana's felony-homicide rule. Specifically, the following issues are raised:

1. Was appellant's right to a fair trial by an impartial jury violated by undue pretrial publicity?

2. Was appellant's constitutional right to a fair trial by an impartial jury violated by the court's limitation of voir dire?

3. Did certain statements made by the prosecutor substantially affect appellant's right to a fair trial?

4. Is Montana's felony-homicide statute, § 45-5-102(1)(b), MCA, unconstitutional?

5. Did the trial judge properly instruct the jury?

## PRETRIAL PUBLICITY AND VOIR DIRE

The first two issues are intertwined. The amount and nature of pretrial publicity surrounding a case affect the defendant's ability to obtain a fair trial by an impartial jury. Thus, freedom of the press rights guaranteed by the First Amendment to the United States Constitution and art. II, § 7 of the 1972 Montana Constitution come face-to-face once again with a defendant's right to a fair trial by an impartial jury, guaranteed by the Sixth Amendment to the United States Constitution and art. II, § 24 of our Constitution.

Voir dire must be used to determine which potential jurors have been so affected by pretrial publicity, they would be unable to render a fair verdict. A trial judge must therefore consider the volume and nature of the pretrial publicity when determining how best to conduct voir dire.

It is undisputed that the media has focused considerable attention on this case. Without specifically detailing the stories told, we acknowledge that the case has been sensationalized and that not all the publicity has been neutral. A defendant's right to a fair trial by an impartial jury is jeopardized when the publicity surrounding the case is inflammatory in nature. State v. Holmes (Mont. 1983), 674 P.2d 1071, 1073, 40 St.Rep. 1973, 1976. Inflammatory publicity is characterized by

> editorializing on the part of the media or any calculated attempt to prejudice public opinion against [defendant] or to destroy the fairness of the pool from which [defendant's] prospective jurors would be drawn.

7

State v. Armstrong (1980), 189 Mont. 407, 423, 616 P.2d 341, 350.

Rather than being inflammatory, much of the publicity in this case was verified, if not generated, by defendant's testimony before television cameras during his son's trial. Defendant's testimony at that trial mirrors his testimony at his own trial. Since much of the negative publicity was actually factual and originated from defendant himself, he cannot now successfully contend that the charges against him should be dropped because of the publicity surrounding his trial.

As mentioned earlier, publicity problems can sometimes be offset by proper voir dire. Defendant's attorney requested that voir dire of the jury panel be closed. However, such a request is seldom granted. It must first be determined that the publicity is so great and so inflammatory that a presumption exists that the jury panel is prejudiced against defendant. United States ex rel. Doggett v. Yeager (3rd Cir. 1973), 472 F.2d 229, 234-235; Coleman v. Kemp (11th Cir. 1985), 778 F.2d 1487, 1541-1542. The Ninth Circuit has adopted the United States Supreme Court's three-step test for making this determination:

1) that public proceedings would result in irreputable damage to defendant's right to a fair trial;

2) that no alternative to closure would adequately protect this right; and

3) that closure would effectively protect it.

United States v. Brooklier (9th Cir. 1982), 685 F.2d 1162, 1167, citing Gannett Co. Inc. v. DePasquale (1979), 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608. There is no proof that closure of voir dire would have protected defendant from the adverse publicity generated, at least somewhat, by his own actions.

8

Whether to close voir dire or not is a question left largely to the discretion of the trial judge. State v. Sunday (1980), 187 Mont 292, 609 P.2d 1188; United States v. McDonald (9th Cir. 1978), 576 F.2d 1350, 1354-1355, cert. denied, 439 U.S. 830 and 439 U.S. 927 (1978). We cannot say the trial judge abused his discretion by refusing to close voir dire in this case. Closed voir dire has been found unnecessary where the publicity is factually accurate and contains the essential facts of the crimes which would ultimately be presented to the jury anyway. State v. Frederick (Wash.App. 1978), 579 P.2d 390, 393, cert. denied, 440 U.S. 985 (1979). The trial judge's plan to question individual veniremen in chambers should the need arise would have been adequate had it been properly implemented. This is especially true since the veniremen were cautioned that if they had strong opinions about the case, they should notify the judge.

However, the manner in which voir dire was conducted was, to be generous, improper. The trial judge's repeated admonitions to defense counsel that a jury would be selected that day and inferences that defense counsel was an obstacle to that end, are inexcusable. The voir dire process, especially in cases given a great amount of publicity, is essential to ensure that defendant is adjudged by fair and impartial jurors. It is this objective for which the court must strive, not expeditious selection of a jury.

Another major problem is defense counsel's examination of the veniremen's preconceived notions of defendant's guilt, which was repeatedly met with sustained objections. Defense counsel was eventually denied permission to ask a juror if he were defendant, would he want someone with his frame of mind sitting on the jury. The state, citing Hill v. Turley (Mont. 1985), 710 P.2d 50, 42 St.Rep. 1783, contends that questions

9

posed by defense counsel regarding how a potential juror would vote at that moment were incorrect.

> It is improper to pose hypothetical questions which have the effect of requiring a pledge or commitment from the juror that he would decide a certain way upon particular instruction as that would have the effect of prejudging the case.

710 P.2d at 56, 42 St.Rep. at 1790.

However, defense counsel was not eliciting a commitment. He was merely attempting to ascertain the intensity of the potential juror's opinion. In fact, the state asked, without objection, a very similar question.

> Q. (By Mr. Racicot) Okay. If you--this is kind of an unfair question--if you were involved in a matter of very large degree and importance to you, would you be comfortable having a juror in your present state of mind?
>
> A. I suppose.
>
> Q. You'd just as soon not be involved at all, I know, but assume for a moment that you were. Do you feel that you'd be comfortable with a person of your state of mind that could render a fair and impartial choice and decision?
>
> A. Yes.

Tr. Vol. I, p. 75, ln. 25; p. 76, ln. 1-11. Inquiries such as this are permissible methods of ascertaining the potential juror's state of mind.

Defense counsel was repeatedly admonished to limit inquiries to whether the potential juror could set aside his impressions of the case and reach a verdict based solely on the evidence presented at trial. Such a question cannot be asked and answered in a vacuum. Defense counsel must be allowed to fully examine the extent of the veniremen's pretrial convictions concerning defendant's guilt. He must also be allowed to determine what would be required to

10

eradicate those convictions. Otherwise, prejudiced jurors will more than likely be on the jury.

The following situation occurred in defendant's trial, with the ultimate result being a juror who might have required defendant to prove his own innocence.

A. (By future juror)  I had an opinion about the kidnapping.

. . .

Q. (By Mr. White)  And based upon that opinion, do you believe that Mr. Nichols is guilty or not guilty of that charge--of just the kidnapping?

A. I don't know.  I have an opinion about the kidnapping, but I don't know if he's guilty or not guilty.

Q. What is your opinion about the kidnapping?  Is it favorable or not favorable to Mr. Nichols' side?

A. It's not favorable.

Q. And is it--is it an opinion you've held for a very long period of time?

A. Yes, when I first heard about it, from the time I first heard about it.

Q. All the way back to--that would have been about a year ago actually?  Has that opinion changed since you first heard about it?

A. No.

. . .

Q. Would it take some evidence by Mr. Nichols to remove that opinion at this time?

A. Yes.

Q. If you were sitting in Mr. Nichols' place now and there was a juror sitting where you are with your opinion, would you want him to try your case with your opinion as it is now?

A. Probably not.

. . .

MR. WHITE: Your Honor, I would challenge [this juror] for cause.

THE COURT: Do you resist this challenge?

MR. RACICOT: We certainly do, Your Honor. We'd ask the Court to inquire.

THE COURT: . . . you recall my exchange with you?

A. Yes, I do.

THE COURT: And you recall when I asked you if you could sit and listen to the evidence received only from this courtroom and render a fair and impartial judgment, and you know what your answer was?

A. Yes.

THE COURT: You bet. Now, is that still your answer?

A. Yes, it is.

THE COURT: All right. Your challenge for cause is denied.

Tr. Vol. I, p. 228, ln. 5-25; p. 229 and p. 230, ln. 1-8.

Although voir dire was conducted in an improper manner, the error was harmless. Given the testimony of defendant at trial, recounted above, any juror would have had to convict defendant of the charges brought against him. Defendant's testimony confirmed the existence of every element of each charge. Therefore the error was not prejudicial. We wish to emphasize, however, that we do not condone the trial court's manner of conducting voir dire and we do not wish to see such procedures before us again.

PREJUDICIAL STATEMENTS BY THE PROSECUTOR

12

Appellant objects to comments during the prosecution's opening statement and closing argument concerning the family of Alan Goldstein and Goldstein's outstanding personal characteristics. The objections focus on the inappropriateness of the comments and the fact that no evidence was submitted in support. The comments were inappropriate. Again, however, it cannot be established from the record that those statements resulted in a denial of a substantial right. State v. Watkins (1971), 156 Mont. 456, 464, 481 P.2d 689, 693. A conviction necessarily followed from defendant's evidence.

CONSTITUTIONALITY OF THE FELONY-HOMICIDE STATUTE

The following statutes are at issue:

Section 45-5-101. Criminal homicide. (1) A person commits the offense of criminal homicide if he purposely, knowingly, or negligently causes the death of another human being.

Section 45-5-102. Deliberate homicide. (1) Except as provided in 45-5-103(1), criminal homicide constitutes deliberate homicide if:
. . .
(b) it is committed while the offender is engaged in or is an accomplice in the commission of, attempting to commit, or flight after committing or attempting to commit robbery, sexual intercourse without consent, arson, burglary, kidnapping, felonious escape, or any other felony which involves the use or threat of physical force or violence against any individual.

Section 45-2-103. General requirements of criminal act and mental state. (1) A person is not guilty of an offense, other than an offense which involves absolute liability, unless, with respect to each element described by the statute defining the offense, he acts while having one of the mental states described in subsections (33), (37), and (58) of 45-2-101 [knowingly, negligently and purposely.]

Appellant contends § 45-5-102(1)(b), MCA, is unconstitutional on its face because it fails to require the state to prove a specific mental state, contrary to statutory mandates contained in §§ 45-5-101 and 45-2-103, MCA. Appellant argues that the statute incorrectly and unconstitutionally requires proof of the commission of or attempt to commit a felony in place of proof of a mental state of purposely or knowingly committing a homicide.

We have addressed this contention before. In State v. Sunday, supra, we discussed the intricacies of proving intent under the felony-homicide statute. We held that when a defendant commits a felony such as burglary, kidnapping or aggravated assault, he initiates conduct which creates a dangerous circumstance. Therefore, the intent to commit the felony supplies the intent for all the consequences, including homicide, arising therefrom. Sunday, 187 Mont. at 307-308, 609 P.2d at 1197, citing Bassiouni, Substantive Criminal Law (1978), at 250, 251.

We expounded on this conclusion in State v. Weinberger (Mont. 1983), 671 P.2d 567, 569, 40 St.Rep. 1539, 1542.

> "It is not the purpose of the felony-murder rule to foist authorship of a homicide upon a felon; the purpose is merely to clothe the felon's act of killing with malice." 2 Wharton's Criminal Law (14th ed.) 221, § 149. Under Montana codes, we would substitute "knowledge or purpose" for the word "malice." Section 45-2-103, MCA.

Certain acts regarded as peculiarly dangerous create a reasonable risk of death. Therefore, the felon who initiates those acts is also responsible for a death arising from those acts.

Despite appellant's allegations to the contrary, this application of the theory of supplied intent does not constitute a violation of defendant's constitutional rights

14

under Sandstrom v. State of Montana (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39. In Sandstrom, the Supreme Court held that jury instructions which eliminate the state's burden of proving an essential element of the crime, i.e. the requisite mental state, create an unconstitutional conclusive presumption against the defendant. Under the felony-homicide statute, the state has not been relieved of the burden of proving an element of a crime. Rather, the method of proving one of the elements has been changed. The state may substitute proof of the mental state necessary to commit a homicide with proof of the mental state required to commit the underlying felony.

The state retains the burden of proving all the elements of the crime. The statute is constitutional.

## INSTRUCTIONS

Appellant objects to numerous instructions given to the jury:

1. Instruction 21, because it pertains to the felony-homicide rule, is unconstitutional;

2. Instructions 22, 23, 24, 25 and 26 are pre-emptory in nature because they instruct the jury as to what it "must" or "should" do;

3. Instruction 26 invades the province of the jury with the following statement:

> However, if you find beyond a reasonable doubt that the defendant committed the offense of Kidnapping and that during the commission of that offense the death of Alan Lee Goldstein was caused, you must find the defendant guilty of Deliberate Homicide as alleged in Count II. (Emphasis added.);

4. Instruction 39 is an improper statement of the law of self-defense. The jury should have been told of defendant's right to self-defense under deliberate homicide - Count I (purposely or knowingly).

15

5. Instruction 42 is irrelevant. The record does not support any intent of a private citizen to make an arrest.

Appellant's objections do not warrant a new trial.

We have already discussed the constitutionality of the felony-homicide rule. None of the complained of instructions are pre-emptory in nature. The words "must" and "should" are used with respect to instructions on the law. The mandatory words are not to direct particular findings of fact, which are the province of the jury. Instruction 23 is a good example:

> You are instructed that to sustain the charge of Deliberate Homicide alleged in Count I, against the defendant Donald Boone Nichols the State <u>must</u> prove that he purposely or knowingly caused the death of Alan Lee Goldstein.

> If you find from your consideration of all the evidence that this proposition has been proved beyond a reasonable doubt, then you <u>should</u> find the defendant, Donald Boone Nichols, guilty of Deliberate Homicide.

> If, on the other hand, you find from your consideration of all the evidence that this proposition has not been proved beyond a reasonable doubt, then you <u>should</u> find the defendant, Donald Boone Nichols, not guilty of Deliberate Homicide. (Emphasis supplied.)

Instructions 25 and 26, when read together and with the other instructions on the felony-homicide rule, particularly Instruction 28, are correct statements of law.

Appellant agreed in the lower court that Instruction 39 was correct with respect to the felony-homicide rule. Since defendant was acquitted of deliberate homicide - Count I (purposely or knowingly), any error created by the failure to give a self-defense instruction with respect to that charge is harmless.

16

The instructions as a whole mirror the statutes from which they were derived. We find no error.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices